**David ZBARAZ, M.D., et al., Plaintiffs,**

**v.**

**Arthur F. QUERN, etc., Defendant.**

**No. 77 C 4522.**

United States District Court,
N. D. Illinois, E. D.

April 29, 1979.

 Robert E. Lehrer, Aviva Futorian, Wendy Meltzer, Legal Asst. Foundation of Chicago, Aviva Futorian, Lois J. Lipton, David Goldberger, Robert Baldwin Foundation of ACLU, Inc., Robert W. Bennett, James D. Weill, Robert E. Lehrer, Robert W. Bennett, Aviva Futorian, Chicago, Ill., for plaintiffs.

James T. Hynes, U. S. Atty., Ann F. Cohen, Barbara A. Babcock, U. S. Dept. of Justice, Jonathan Ginsburg, Justice Dept. Civil Litigation Div., Washington, D. C., for intervenor.

William J. Scott, Atty. Gen., William Wenzel, Jean Golden, Sp. Asst. Attys. Gen., John D. Gorby and Thomas J. Marzen, Patrick A. Trueman, Dennis J. Horan, Americans United for Life Legal Defense Fund, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs brought this class action[1] under 42 U.S.C. Section 1983 to enjoin en-

---

1. The classes certified by the district court consist of (1) all pregnant women eligible for the Illinois medical assistance programs for whom an abortion is medically necessary but not necessary for the preservation of their lives and who wish such abortion performed, and (2) all Illinois physicians who are certified to obtain reimbursement for necessary medical services

forcement of a 1977 Illinois statute withdrawing medical assistance funding in Illinois for all abortions except those "necessary for the preservation of the life of the [pregnant] woman." P.A. 80–1091, Ill.Rev. Stat.Supp.1978, ch. 23, Sections 5–5, 6–1, 7–1.[2] Plaintiffs are two doctors who perform medically necessary, but not necessarily life-preserving abortions for indigent women; the Chicago Welfare Rights Organization, whose members include women dependent on Illinois medical assistance benefits; and Jane Doe, an indigent woman for whom an abortion is medically necessary but not necessary for the preservation of her life. Defendant Arthur Quern is the Director of the Illinois Department of Public Aid, the state agency responsible for administering Illinois medical assistance programs. Intervenor-defendants include two doctors and the United States.

The complaint alleged that P.A. 80–1091 violated plaintiffs' rights under the Social Security Act, 42 U.S.C. Section 1396 *et seq.*, and the Ninth and Fourteenth Amendments to the United States Constitution. Plaintiffs sought both declaratory and injunctive relief. The case was originally assigned to Judge Kirkland. On December 21, 1977, he ordered the proceedings stayed pending an interpretation of P.A. 80–1091 by an Illinois state court. Reasoning that the Illinois statute could be construed to be consistent with the Social Security Act, Judge Kirk-

land decided the exercise of federal jurisdiction at the time would be imprudent. He therefore merely entered and continued plaintiffs' motion for preliminary relief. (Memorandum Opinion and Order of December 21, 1977, at 3–5).

Plaintiffs appealed and the Seventh Circuit reversed. *Zbaraz v. Quern*, 572 F.2d 582 (7th Cir. 1978). In its ruling, the Court of Appeals declined to decide the merits of plaintiffs' motion for a temporary restraining order and/or preliminary injunction. Instead, the court remanded the case to the district court for expeditious consideration of the question of preliminary relief.

On remand, Judge Kirkland held that by failing to cover "medically necessary" abortions, P.A. 80–1091 violated the Social Security Act and its implementing regulations. The court reasoned that Illinois' funding of only "life-preserving" abortions fell short of its responsibilities under Title XIX to establish "reasonable standards . . . for determining . . . the extent of medical assistance under the plans which . . . are consistent with the objectives of [the Medicaid program]," 42 U.S.C. Section 1396a(17). The court noted that the prime objective of Medicaid is to "furnish . . . medical assistance [to eligible persons] to meet the costs of necessary medical services." 42 U.S.C. Section 1396. (Memorandum Opinion of May 15, 1978, at 8–11).

---

rendered to, and who perform medically necessary abortions for, persons eligible for the Illinois medical assistance programs.

2. Those sections provide, in relevant part:

Sec. 5–5. The Illinois Department, by rule, shall determine the quantity and quality of the medical assistance for which payment will be authorized, and the medical services to be provided, which may include all or part of the following: . . . but not including abortions, or induced miscarriages or premature births, unless, in the opinion of the physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a live viable child and such procedure is necessary for the health of the mother or her unborn child.

Section 6–1. Nothing in this Article shall be construed to permit the granting of financial aid where the purpose of such aid is to

obtain an abortion, induced miscarriage or induced premature birth unless, in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a live viable child and such procedure is necessary for the health of the mother or her unborn child.

Section 7–1. Aid in meeting the costs of necessary medical, dental, hospital, boarding or nursing care, . . . except where such aid is for the purpose of obtaining an abortion, induced miscarriage or induced premature birth unless, in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a viable child and such procedure is necessary for the health of the mother or her unborn child.

In his decision, Judge Kirkland also considered the impact of the Hyde Amendment on a state's responsibilities under Title XIX. The Hyde Amendment, first enacted as a rider to the 1977 fiscal year budget for the Department of Health, Education and Welfare, provides:

> None of the funds provided for in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.

Section 210 of Pub.L. 95–480; 92 Stat. 1586, Oct. 18, 1978. Judge Kirkland interpreted the Hyde Amendment as a prohibition on the use of federal funds rather than a substantive amendment to the Social Security Act. A state's obligations under Title XIX to fund medically necessary abortions, Judge Kirkland thus concluded, survived passage of the Hyde Amendment. Judge Kirkland issued a permanent injunction restraining defendants from enforcing P.A.

80–1091 to deny payments under the Illinois medical assistance programs for therapeutic abortions. (Memorandum Opinion of May 15, 1978, at 11–12).

Defendants appealed and again the Seventh Circuit reversed. *Zbaraz v. Quern*, 596 F.2d 196 (1979). Following the lead of the First Circuit Court of Appeals in *Preterm, Inc. v. Dukakis*, 591 F.2d 121 (1st Cir. 1979), the court held that the Hyde Amendment, by singling out abortions as a category of care which would be funded only under certain narrow circumstances, conflicted unavoidably with Title XIX. Despite its seemingly unambiguous language and its location in an appropriations measure, therefore, the Seventh Circuit concluded that the Hyde Amendment was not just a limitation on the use of federal funds, but an amendment to Title XIX as well. 596 F.2d at 200. Since the Amendment removed all but a narrow category of abortions from Medicaid coverage, it effectively permitted states also to withhold funds from non-Hyde Amendment abortions 596 F.2d at 201.

The Court of Appeals recognized the constitutional questions raised by its holding[3] and remanded the case to the district court with directions to modify the permanent injunction and to decide the constitutional questions.[4] 596 F.2d at 202.

**3.** The Seventh Circuit included in its mandate a directive to pass on the constitutionality of the Hyde Amendment, even though plaintiffs attack only the legality of an Illinois statute. After remand, therefore, the United States was permitted to intervene pursuant to 28 U.S.C. Section 2403(a). In its brief in support of the constitutionality of the Hyde Amendment, the United States suggested that the Seventh Circuit "viewed the federal and state legislation as inextricably intertwined." (Brief for the United States, at 4). Although we are not persuaded that the federal and state enactments are inseparable and would hesitate to inject into the proceeding the issue of the constitutionality of a law not directly under attack by plaintiffs, we are obviously constrained to obey the Seventh Circuit's mandate. Therefore, while our discussion of the constitutional questions will address only the Illinois statute, the same analysis applies to the Hyde Amendment and the relief granted will encompass both laws. We note that although the Fifth Amendment does not contain an express Equal Protection Clause, its Due Process Clause has been construed to in-

corporate equal protection guarantees. *Weinberger v. Salfi*, 422 U.S. 749, 770, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

4. The Seventh Circuit instructed the district court to determine whether the withholding of funds for "medically necessary" abortions violated the constitution. 596 F.2d at 202. Prior to P.A. 80-1091, Illinois funded "therapeutic" abortions, defined as "medically necessary or medically indicated according to the professional medical judgment of a licensed physician in Illinois, exercised in light of all factors affecting a woman's health." State of Illinois Dept. of Public Aid—Medical Assistance Program Handbook for Physicians, January, 1976, A-204. The Seventh Circuit adopted this definition of "therapeutic" without addressing the question of whether it was broader than "medically necessary." Judge Kirkland treated the two as synonymous. (See Order of May 15, 1978, at 10). Whether the terms "medically

Pursuant to the Seventh Circuit's mandate, Judge Kirkland modified his permanent injunction to require Illinois to fund under its medical assistance programs abortions which fall within the scope of the Hyde Amendment exceptions. (Minute Order entered February 15, 1979). Judge Kirkland set a briefing schedule, but then determined that for medical reasons he would be unable to give the case the "expeditious consideration" ordered by the Seventh Circuit. The case was reassigned to us on April 18, 1979.

Now pending are the parties' cross-motions for summary judgment and plaintiffs' motion for a temporary restraining order. The latter motion is a response by plaintiffs to the announced intention of the Illinois Department of Public Aid to deny reimbursements for all abortions except those which it is required to fund by Judge Kirkland's modified injunction—that is, abortions still covered under the Hyde Amendment—beginning May 1. For the reasons which follow, we will grant partial summary judgment for both plaintiffs and defendants.

Although plaintiffs raised a number of constitutional issues in their complaint,[5] their principal argument is that, by imposing restrictions on the public funding of medically necessary abortions which are not imposed on other medically necessary operations, P.A. 80–1091 violates their rights to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.[6] The framework for analyzing claims of alleged deprivations of equal protection is now well-established:

> We must decide, first, whether [the statute] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination
> . . . . .

*San Antonio School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

Relying on *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and subsequent abortion decisions, plaintiffs contend that strict judicial scrutiny is appropriate here because a fundamental right is implicated. In *Roe,* the Supreme Court struck down a Texas statute that made criminal the performance or procurement of an abortion unnecessary to save a mother's life.

necessary" and "therapeutic" are coextensive is a question that is not merely of academic significance. If, by attacking the constitutionality of P.A. 80–1091, plaintiffs are advocating a return to the status quo ante, then presumably a decision in their favor would result in the funding of all "therapeutic" abortions. But as we read the complaint, plaintiffs seek funding for "medically necessary" abortions, whether or not that is broad enough to include all "therapeutic" abortions. This reading harmonizes with plaintiffs' theory of the case—that by funding "medically necessary" operations other than abortions, Illinois is denying plaintiffs equal protection of the laws. Accordingly, we will treat the action as an attack on Illinois' failure to fund "medically necessary" abortions.

5. Plaintiffs also alleged that P.A. 80–1091 violated the Establishment and Free Exercise Clauses of the First Amendment to the Constitution made applicable to the states by the fourteenth amendment, and the Due Process Clause of the Fourteenth Amendment. (Complaint, par. 22(d)). Plaintiffs' due process claim rests on their argument that the statute disrupts "the carefully constructed balance of constitutional interests *Wade* and its progeny established." (Memorandum in Support of Motion for Summary Judgment, at 22). We believe this contention is subsumed under their equal protection challenge, and we will not treat it separately in this opinion.

6. Plaintiffs have also challenged as unconstitutional the reporting requirement for rape victims. None of the plaintiffs, however, have asserted any personal stake in the determination of this issue. Where, as here, a statute contains separable provisions, a person may challenge only those provisions which operate to injure him, and may not challenge those provisions that cause him no harm. *See Bell v. Hongisto,* 501 F.2d 346 (9th Cir. 1974), *cert. denied* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

The Texas legislation was constitutionally infirm, the Court held, because for every stage of a woman's pregnancy, it subordinated the woman's right to privacy, a right which "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy," to the state's interests in preserving maternal health and promoting fetal life. 410 U.S. at 153, 93 S.Ct. at 727. The Court emphasized, however, that although the right of personal privacy "includes the abortion decision . . . this right is not unqualified and must be considered against important state interests in regulation." 410 U.S. at 154, 93 S.Ct. at 727. *See also, Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

Thus, the right recognized in *Roe* is not an affirmative right to an abortion, but is simply a right to make and effectuate the abortion decision, at least in the first trimester of pregnancy, free from governmental regulation. During the second trimester, a state may restrict the effectuation of that decision only in a manner that reasonably promotes the health of the mother. After the fetus has achieved viability, a state may constitutionally proscribe abortion "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 410 U.S. at 164, 165, 93 S.Ct. at 732.

■ Plaintiffs argue here that by erecting a "substantial impediment to poor women's obtaining medically necessary abortions," P.A. 80–1091 restricts the effectuation of their decision to "bear or beget a child," and thereby triggers strict scrutiny. We believe this argument has been explicitly rejected by the United States Supreme Court in *Maher v. Roe*, 432 U.S. 464, 470, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and is therefore foreclosed to plaintiffs here. In *Maher*, the Supreme Court held that the Constitution does not require a state participating in Social Security to pay for nontherapeutic abortions although it pays the expenses of childbirth. Plaintiffs in *Maher* argued that the Connecticut medical assistance scheme infringed upon their fundamental rights as announced in *Roe v. Wade*. Rejecting this contention, the Court observed:

> [*Roe*] implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.

> \*　　\*　　\*　　\*　　\*　　\*

> The indigency that may make it difficult—and in some cases, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation.

> \*　　\*　　\*　　\*　　\*　　\*

> There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.

432 U.S. at 474, 475, 97 S.Ct. at 2382, 2383.

As in *Maher*, plaintiffs here will encounter difficulty effectuating their decision to terminate a pregnancy not because of any state regulation, but because of their indigency. *Maher* compels the conclusion, therefore, that P.A. 80–1091 impinges upon no fundamental right and should not be subjected to strict judicial scrutiny.[7]

In further support of their argument that strict scrutiny is appropriate here, plaintiffs analogize to the case of *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). There the Supreme Court declared unconstitutional various state statutory provisions which denied welfare assistance to persons who had not satisfied one year residency requirements, but who were otherwise eligible for welfare benefits. The Court reasoned that by treating indigents who had resided in the state less than a year differently from those who had satisfied the residency requirement, the state

---

7. Plaintiffs apparently do not argue that P.A. 80–1091 creates a "suspect classification." This argument would also be unavailing under *Maher*. There the Supreme Court stated that, "[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection." 432 U.S. at 470, 97 S.Ct. at 2381.

was penalizing indigents' rights to migrate, or travel interstate. Since the right to travel interstate was deemed "fundamental," the Court subjected the statutes to strict scrutiny. Finding no compelling justification for treating one year residents differently, the Court concluded that the statutes were unconstitutional. The Court noted that if the purpose of the provisions was to deter migration, or prevent an influx of indigents seeking higher welfare benefits, those purposes were "constitutionally impermissible." 394 U.S. at 631, 89 S.Ct. 1322.

In this case, plaintiffs contend that Illinois is penalizing indigent women who desire to exercise their right to effectuate the abortion decision. We believe that again *Maher* disposes of this argument. As the *Maher* Court observed:

> [T]he claim here is that the State "penalizes" the woman's decision to have an abortion by refusing to pay for it. Shapiro and Maricopa County did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of the indigent travelers. We find no support in the right to travel cases for the view that Connecticut must show a compelling interest for its decision not to fund elective abortions.

432 U.S. at 475, n.8, 97 S.Ct. at 2383. Since there is no fundamental right to a publicly funded abortion, the analogy to *Shapiro* fails, "penalty analysis" does not apply, and strict scrutiny is unnecessary.

■ Our determination that P.A. 80–1091 should not be subjected to strict judicial scrutiny, however, does not resolve the question of the statute's constitutionality. Whenever a statute treats different classes of individuals differently, that legislative line-drawing is properly the subject of judicial examination. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Here, since indigent women in medical need of abortions are treated differently than indigent

women in medical need of other surgical procedures, we must subject the statute to the rational relationship test. Under this test, the statute passes constitutional muster only if we can conclude that the legislative classification rationally furthers some legitimate, articulated state purpose. *Id.* As the Supreme Court observed in *Maher*, in applying the identical test,

> The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents. But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations.

432 U.S. at 469–70, 97 S.Ct. at 2380.

■ The various defendants have suggested that the statute is supported by the state's legitimate interests in "fiscal frugality" and in protecting fetal life through the encouragement of childbirth. While the allocation of limited public funds is a legitimate interest of the state, *see generally, Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), we do not believe that the Illinois funding policy is rationally related to this purpose. In fact, the record in this case supports the contrary conclusion that the costs of prenatal care, childbirth and postpartum care are substantially higher than the cost of abortions.[8] All of the births in question involve women who have encountered complications in their pregnancies, which would presumably increase the cost of needed medical care. Of course, if the newborn child then receives public aid, the cost differential is even greater. The Illinois General Assembly was well aware of these potential cost differences, as shown by the remarks of Senator Lemke, Senate sponsor of P.A. 80–1091:

> My people don't want abortions being performed with their money. If it costs them more to support these children after

---

8. Plaintiffs have produced convincing statistical evidence that the average State payment for an abortion is approximately $145.00, compared to an average cost to the State of $1,370.00 for funding a childbirth.

they're born, they will pay that money gladly as long as it's properly used. Debate on H.B. 333, Illinois Senate, June 27, 1977. In short, P.A. 80–1091 was not, and could not be, motivated by economic concerns.

The other state interest offered in support of the state classification is the protection of the fetus through the encouragement of childbirth. The Supreme Court has recognized this as a legitimate state interest in some circumstances. *See Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Maher*, the Court held that Connecticut could encourage "normal childbirth" by subsidizing the costs incident to childbirth while, at the same time, refusing to expend funds for *nontherapeutic* (purely elective) abortions. The Connecticut statute differed from the Illinois statute challenged here because it provided for the funding of "medically necessary" abortions.

We believe this distinction to be crucial to the determination of this case.

 Under *Maher*, a state may legitimately prefer childbirth to an elective abortion. We do not believe, however, that a state has a legitimate interest in promoting the life of a non-viable fetus in a woman for whom an abortion is medically necessary.[9] This approach, which recognizes that the fetus is being carried within a living, human being, is consistent with Supreme Court decisions which suggest that the interest in the fetus cannot be isolated from the interest in the health of the mother. *See generally, Roe v. Wade*, 410 U.S. at 159, 93 S.Ct. 705; *Colautti v. Franklin*, —— U.S. ——, 99 S.Ct. 675, 688, 58 L.Ed.2d 596 (1979).[10]

As a consequence of the state's viewing the fetus apart from the mother, the mother may be subjected to considerable risk of severe medical problems, which may even result in her death. Under the Hyde

---

**9.** *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), does not require a contrary result. There a woman challenged a city policy that prohibited the performance of abortions in city-owned hospitals for reasons other than to save the mother from grave physiological injury or death. When plaintiff was examined by hospital physicians, however, physicians could not find "any 'medical reasons' to justify an abortion," such as "severe sickness of the patient." 515 F.2d at 543. Accordingly, the Court of Appeals treated the case as one where plaintiff demanded a "nontherapuetic" abortion. 515 F.2d at 545. When the case was appealed, the Supreme Court adopted the lower court's characterization of the issue in upholding the city policy. 432 U.S. at 521, 97 S.Ct. 2391. Because the Court viewed plaintiff's argument as an attack on the city's withholding of city-owned facilities for elective, or nontherapeutic abortions, *Maher* of course controlled. In this case the plaintiff class is defined in terms of indigent women for whom abortions are medically necessary. We agree with plaintiffs that the Supreme Court could not have intended in its per curiam *Poelker* decision to obliterate the distinction it had carefully drawn in *Maher* between medically necessary and nontherapeutic abortions. We note, however, that at least two district courts have given *Poelker v. Doe* the sweeping interpretation we reject here. *Doe v. Mundy*, 441 F.Supp. 447, 451–52 (E.D.Wis.1977); *Frieman*

*v. Walsh*, No. 77–4171–CV–C (W.D.Mo. filed January 26, 1979).

**10.** *Colautti v. Franklin*, —— U.S. ——, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) involved a challenge to a Pennsylvania statute which subjected a physician who performed an abortion to potential criminal liability if he failed to utilize a statutorily prescribed technique when the fetus was "viable," or when there was sufficient reason to believe that the fetus was viable. The Court stated:

> Moreover, the second part of the standard directs the physician to employ the abortion technique best suited to fetal survival "so long as a different technique would not be *necessary* in order to preserve the life or health of the mother." (Emphasis supplied). In this context, the word "necessary" suggests that a particular technique must be indispensable to the woman's life or health— not merely desirable—before it may be adopted.
>
> \* \* \* \* \* \*
>
> Consequently, it is uncertain whether the statute permits the physician to consider his duty to the patient to be paramount to his duty to the fetus, or whether it requires the physician to make a "trade-off" between the woman's health and additional percentage points of fetal survival. Serious ethical and constitutional difficulties, that we do not address, lurk behind this ambiguity.

Amendment standard, a doctor may not certify a woman as being eligible for a publicly funded abortion except where "the life of the mother would be endangered . . . or . . . where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term . . . ." Most health problems associated with pregnancy would not be covered by this language, (Affidavit of Dr. Oren Richard Depp, p. 10; Affidavit of Dr. David Zbaraz), and those that would be covered would often not be apparent until the later stages of pregnancy, when an abortion is more dangerous to the mother (Affidavit of Dr. Depp, pp. 4–5). At the earlier stages of pregnancy, and even at the later stages, doctors are usually unable to determine the degree of injury which may result from a particular medical condition. *Id.* at 4. The effect of the new criteria, then, will be to increase substantially maternal morbidity and mortality among indigent pregnant women. *Id.* at 12.[11]

We cannot hold that the state has a legitimate interest in preserving the life of a non-viable fetus at the cost of increased maternal morbidity and mortality among indigent pregnant women. In *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Supreme Court was faced with a challenge to an Arizona statute which required one year's residence in a county as a condition

to receiving non-emergency hospitalization or medical care at the county's expense. In striking down the state statute as infringing on the fundamental right to interstate travel, the Supreme Court stated:

"Evaro was an indigent person who *required* continued medical care for the preservation of his health and well being . . . ," even if he did not require immediate emergency care. The State could not deny Evaro care just because, although gasping for breath, he was not in immediate danger of stopping breathing altogether. To allow a serious illness to go untreated until it requires emergency hospitalization is to subject the sufferer to the danger of a substantial and irrevocable deterioration in his health. Cancer, heart disease, or respiratory illness, if untreated for a year, may become all but irreversible paths to pain, disability, and even loss of life. The denial of medical care is all the more *cruel* in this context, falling as it does on indigents who are often without the means to obtain alternative treatment.

415 U.S. at 260–61, 94 S.Ct. at 1083 (emphasis added). Like the Arizona statute in *Maricopa County*, the Illinois statute as modified will deny needed medical aid to indigent mothers until the point when a doctor is able to certify that the mother's life is endangered or when severe and long-lasting physical health damage[12] appears

---

11. Moreover, the new Illinois criteria completely ignore the very serious threats to an indigent pregnant woman's psychological or psychiatric health that may make an abortion medically necessary. One doctor has estimated that approximately 15 per cent of a representative group of women desiring abortions have a psychiatric need for an abortion. He also concluded that indigent women are more likely than are non-indigent women to suffer adverse mental health consequences from unwanted pregnancy. (Affidavit of Dr. Peter Barglow, at 4, 6).

12. The affidavits submitted by plaintiffs give many examples of medical conditions which would not be covered by the new Illinois standards, but which could pose a great threat to the safety of the mother. For example, the affidavit of Dr. David Zbaraz states, at pp. 5–6:

The lack of certainty about predictions extends to even the most serious of potentially life-threatening conditions. For example, women with sickle cell disease have a 25 per cent probability of going into sickle cell crisis and dying as a result of pregnancy. (The normal pregnancy mortality rate is 20 per 100,000). Because of this extraordinarily high mortality rate, abortions for women with sickle cell disease are almost universally acknowledged to be "medically necessary." I would thus actively counsel such women to have abortions, unless they expressed a very strong desire to have the child. Yet it simply cannot be known, however careful her care and physician's monitoring, whether a particular patient will go into crisis, or whether the state of her disease will remain unaffected by pregnancy. It would not be proper medical care to wait for such an actual threat before

certain to occur. Action that the Supreme Court characterized as "cruel" in *Maricopa County* can hardly be considered as a permissible side effect of a "legitimate" state interest in the present case.

As the Supreme Court recognized in *Roe*, however, the state's interest in promoting fetal life grows with the length of the pregnancy. At any point in the pregnancy term, the strength of the state's interest can only be determined by balancing "the relative weights of the respective interests involved." *Roe v. Wade*, 410 U.S. at 165, 93 S.Ct. at 733. After the point of viability, for instance, that interest is regarded as "compelling," and justifies the proscription of abortion, except when it is necessary to preserve the life or health of the mother. 410 U.S. at 164, 93 S.Ct. 705.

■ Similarly, the state's interest in promoting the life of a fetus carried in a woman for whom an abortion is medically necessary is not constant. For the reasons just discussed, a pregnant woman's interest in her health so outweighs any possible state interest in the life of a non-viable fetus that, for a woman medically in need of an abortion, the state's interest is not legitimate. At the point of viability, however, "the relative weights of the respective interests involved" shift, thereby legitimizing the state's interest. After that point, therefore, we believe a state may withhold funding for medically necessary abortions that are not life-preserving, even though it funds all other medically necessary operations. We thus conclude that, as it applies to the abortion of a viable fetus, P.A. 80–1091 (as modified by court order) is constitutional.

We recognize that, as with any standard that relies on the judgment of the individual administering it, "medical necessity" may be subject to deliberate misinterpretation and abuse. Some would argue that unscrupulous physicians, with the active encouragement of their indigent patients, will transform our decision into a *de facto* order

that the state fund purely elective abortions. Such a result would, of course, be squarely contrary to the Supreme Court's *Maher* decision. Nonetheless, we believe the inherent elasticity of the standard we adopt today will pose no greater problem to the state's administration of its medical assistance programs than it did under the funding scheme that preceded P.A. 80–1091. Furthermore, we are encouraged by affidavits submitted by respected members of the medical profession that suggest that the percentage of abortions any physician would deem "medically necessary" may be as low as one fifth of the representative cases in which a pregnant woman desires an abortion. (Affidavit of Dr. Oren Depp, at 7). Finally, we note that providers of services under Illinois medical assistance programs are subject to civil and criminal penalties for filing false Medicaid reimbursement reports. 42 U.S.C. Section 1396h; Ill. Rev.Stat. ch. 23, Sections 12–15, 12–15.1.

## CONCLUSION

■ We hold that the Hyde Amendment and P.A. 80–1091 are unconstitutional as applied to medically necessary abortions prior to the point of fetal viability. All parties are to appear on Monday, April 30, 1979, at 9:30 a. m. to discuss the problems of relief and notice. Plaintiffs are to prepare an appropriate judgment order and order granting injunctive relief for submission to the court on Monday, April 30, 1979.

---

terminating the pregnancy, if the patient did not want to incur the risk. Yet the Illinois standard, by requiring certainty about the outcome of a pregnancy, does not compre-

hend this inherent uncertainty in medical judgment prior to the onset of actual health crises.