(No. 81-CC-1479

DR. ULRICH G. KLOPFER, Claimant, *v.* ILLINOIS DEPARTMENT OF PUBLIC AID, Respondent.

*Opinion filed August 1, 1990.*

*Opinion filed September 29, 1993.*

COOKE, LEWIS & LAPAT (MICHAEL LAPAT, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (ERIN O'CONNELL, Assistant Attorney General, of counsel), for Respondent.

## OPINION

PATCHETT, J.

This is a claim brought by Dr. Ulrich G. Klopfer, a licensed physician in the State of Illinois. Dr. Klopfer

5

seeks the sum of $165,333.20 for 931 abortions performed by him for Public Aid recipients from June 1978 to February 1979.

This case has raised a myriad of interesting, complex, and difficult issues. The basic facts are these:

In September 1976, the United States Congress enacted legislation known as the "Hyde Amendment." The Hyde Amendment was a provision which was enacted in varying forms into appropriation bills funding the Department of Health, Education and Welfare and the Labor department commencing with fiscal year 1977. The fiscal 1978 and 1979 versions of the Hyde Amendment provided as follows:

"None of the funds provided for in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." Section 210 of Public Act 95—480; 92 Stat. 1586, October 18, 1978.

Because of Illinois' participation in the Medicaid program, the Illinois legislature, by Public Act 80—1091, effective November 17, 1977, amended the Illinois Public Aid Code, sections 5—5, 6—1, and 7—1 as follows:

"ARTICLE V—MEDICAL ASSISTANCE

5—5 Medical Services

5—5 The Illinois Department, by rule, shall determine the quantity and quality of the medical assistance for which payment will be authorized, and the medical services to be provided, which may include all or part of the following: ° ° ° (16) any other medical care, and any other types of remedial care recognized under the laws of the State, *but not including abortions, or induced miscarriages or premature births, unless, in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a live viable child and such procedure is necessary for the health of the mother or her unborn child.*" Chapter 23, Charities and Public Welfare, Section 5—5. (Amendatory language italicized.)

"ARTICLE VI—MEDICAL ASSISTANCE

6—1 Eligibility Requirements

6—1 Eligibility Requirements. Financial Aid in meeting basic maintenance requirements for a livelihood compatible with health and well-being, plus any necessary treatment, care and supplies required because of illness or disability, shall be given under this Article to or in behalf of persons who meet the eligibility conditions of Sections 6—1.1 through 6—1.6. *Nothing in this Article shall be construed to permit the granting of financial aid where the purpose of such aid is to obtain an abortion, induced miscarriage, or induced premature birth unless, in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a live viable child and such procedure is necessary for the health of the mother or her unborn child.*" Chapter 23, Charities and Public Welfare, Section 6—1. (Amendatory language italicized.)

"ARTICLE VII—
LOCAL AID TO THE MEDICALLY INDIGENT

7—1 Eligibility Requirements

7—1 Eligibility Requirements. Aid in meeting the costs of necessary medical, dental, hospital, boarding or nursing care, or burial shall be given under this Article to or in behalf of any person who meets the eligibility conditions of Sections 7—1.1 through 7—1.3, *except where such aid is for the purpose of obtaining an abortion, induced miscarriage, or induced premature birth unless, in the opinion of a physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment, or except an induced premature birth intended to produce a live viable child and such procedure is necessary for the health of the mother or her unborn child.*" Chapter 23, Charities and Public Welfare, Section 7—1. (Amendatory language italicized.)

Following the passage of the aforesaid act, certain individuals brought a class action in the United States District Court for the northern district of Illinois, eastern division, seeking to enjoin enforcement of the aforesaid Illinois statute. A quote from that case follows:

"Plaintiffs brought this class action under 42 U.S.C. Section 1983 to enjoin enforcement of a 1977 Illinois statute withdrawing medical assistance funding in Illinois for all abortions except those "necessary for the preservation of the life of the (pregnant) woman." P.A. 80—1091, Ill. Rev. Stat. Supp. 1978, Ch. 23, Sections 5—5, 6—1, 7—1. Plaintiffs are two doctors who perform medically necessary, but not necessarily life-preserving, abortions for indigent women; the Chicago Welfare Rights Organization, whose members include women dependent on Illinois medical assistance benefits; and Jane Doe, an indigent woman for whom an abortion is medically necessary, but not necessary for the preservation of her life. Defendant Arthur Quern is the Director of the Illinois Department of Public Aid, the State agency responsible for

administering Illinois medical assistance programs. Intervenor-defendants include two doctors and the United States.

1. The classes certified by the District Court consist of (1) all pregnant women eligible for the Illinois medical assistance programs for whom an abortion is medically necessary, but not necessary for the preservation of their lives and who wish such abortion performed, and (2) all Illinois physicians who are certified to obtain reimbursement for necessary medical services rendered to, and who perform medically necessary abortions for, persons eligible for the Illinois medical assistance programs." *Zbaraz v. Quern*, 469 F. Supp. 1212, 1213-14 (1980).

On December 21, 1977, Judge Kirkland, of the aforesaid United States District Court, ordered the proceedings stayed, pending an interpretation of Public Act 80—1091 by an Illinois State court. The plaintiffs then appealed that order to the United States Court of Appeals, Seventh Circuit. That court overruled Judge Kirkland and remanded the case to the United States District Court. In its opinion, the United States Court of Appeals, Seventh Circuit, stated:

"In December 1977, the District Court issued an order abstaining from consideration of the case. Plaintiffs appealed, and this Court granted them an injunction pending appeal against enforcement of the Illinois statute insofar as it prohibits state funding for therapeutic abortions.

o o o

3. Our injunction order defined 'therapeutic' as 'medically necessary or medically indicated according to the professional medical judgment of a licensed physician in Illinois, exercised in light of all factors affecting a woman's health.' The District Court employed this definition in its final judgment now here on appeal." *Zbaraz v. Quern*, 596 F.2d 196, 197-198.

Judge Kirkland, in considering the case after remand, held that by failing to cover "medically necessary" abortions, Public Act 80—1091 violated the Social Security Act and its underlying regulations. Judge Kirkland then issued a permanent injunction restraining the Illinois Department of Public Aid from enforcing Public Act 80—1091 in such a manner as to deny payments under the Illinois Medical Assistance programs for therapeutic abortions. *Zbaraz v. Quern*, 469 F. Supp. 1212.

The plaintiffs once again appealed to the United States Court of Appeals, Seventh Circuit. In an opinion of

February 13, 1979, the appellate court again remanded the case to the district court. Grounds for the remand this time were that Judge Kirkland had resolved the case on statutory grounds and did not resolve any potential constitutional challenges.

"As noted, the District Court did not reach the Constitutional arguments raised by the parties because it had statutory grounds for its decision. Because the Constitutional issues were not considered below, and in light of the fact that our interpretation of the Hyde Amendment to modify the requirements of Title XIX may alter the Constitutional considerations, it would be inappropriate for us to pass on them now. The parties should have a full opportunity to develop their positions and the District Court to rule on them. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 49 L. Ed. 2d 2826. Therefore, we remand the case for expedited consideration of the Constitutional questions that remain open." *Zbaraz v. Quern*, 596 F.2d 196, 202.

After the second remand, Judge Kirkland recused himself from the case for medical reasons. It was then assigned to Judge Grady who wrote the district court's next opinion, dated April 29, 1979. Judge Grady held both the Hyde Amendment and Public Act 80—1091 as unconstitutional, as applied to medically necessary abortions prior to the point of fetal viability. *Zbaraz v. Quern*, 469 F. Supp. 1212, 1221.

The defendants then sought a direct appeal before the United States Supreme Court. That Court, in *Williams v. Zbaraz* (1980), 100 S. Ct. 2694, held that Public Act 80—1091, and the Hyde Amendment, were not unconstitutional. In addition, that Court held that the district court lacked jurisdiction to consider the constitutionality of the Hyde Amendment.

The Respondent has explicitly acknowledged that from June 1978 to February 1979, the period in which the 931 abortions at issue here were performed, a binding permanent injunction issued by the United States District Court for the northern district of Illinois, eastern division, was in force.

As a result of the first injunction, which was issued by the United States Court of Appeals, Seventh Circuit, in its opinion of January 18, 1978, the Illinois Department of Public Aid sent a notice to medical providers notifying them of the recent court order. The Illinois Department of Public Aid also furnished them with a copy of a new abortion certification. The Department also sent out a "Medicaid Message" furnishing basically the same information. Those documents defined therapeutic. Those documents further provided:

"The Department will comply with the terms of this injunction and will, so long as the injunction remains in force, render the appropriate payment for 'therapeutic' abortions performed on or after January 11, 1978, upon receipt of the appropriate DPA Form 132 or DPA Form 117 submitted stapled to the newly revised 'Abortion Certification,' a copy of which is printed on the reverse side of this sheet."

Following the first remand, and the subsequent issuance of Judge Kirkland's injunction dated June 13, 1978, the Illinois Department of Public Aid once again sent out a notice to medical providers providing information and definitions essentially equivalent to those quoted above. Copies of these notifications are attached to this opinion and made a part hereof by reference.

The trial of this case began before a Commissioner of this Court on August 1, 1983. The Claimant made a long and explicit *prima facie* case with respect to each billing his office had submitted to the Department of Public Aid. It appears that each billing was submitted on the prescribed billing forms, correctly filled out, and accompanied by a required abortion certificate, which was correctly filled out and signed by the Claimant. That is, with respect to each abortion for which the Claimant seeks funds, he, as a licensed physician, had certified that on a given date, for a given patient, he had performed an abortion which was medically necessary or medically indicated

according to his medical judgment exercised in light of all the facts affecting the patient's health.

Initially, all of the claims in question were accepted by the Illinois Department of Public Aid, processed through that department's vouchering unit, and forwarded to the comptroller's office for payment. It appears from the record that the comptroller's office rejected the claims, and it returned them to the Illinois Department of Public Aid Bureau of Program Integrity.

Unfortunately, the record is not particularly clear regarding the reasons for the comptroller's rejection of these claims. It certainly appears from the record that the comptroller questioned the repeated and numerous diagnoses by the Claimant. Many of these diagnoses and certifications were identical in the terms of their wording. In any event, after the claims were returned to the Bureau of Program Integrity, they were ultimately rejected by the Illinois Department of Public Aid and returned to the Claimant with an explanation as to the reason for their rejection. This transmittal basically began on March 6, 1979.

As indicated by the United States Supreme Court in its opinion, after the permanent injunction was entered by the district court, an application for stay of its order was refused by the district court. The director of the Illinois Department of Public Aid and certain intervening defendant physicians moved in the United States Supreme Court for a stay pending appeal. That was also denied. A reapplication was further denied. The United States Supreme Court issued its opinion on June 30, 1980, in which it held that the Hyde Amendment and the Illinois statute in question, Public Act 80—1091, were not unconstitutional. Initial payment for these abortions was denied in March 1979. A complaint was originally filed on January 16, 1981.

It also appears that during the time in question, 31 other claims submitted by this Claimant were ultimately paid, after having been rejected. Although difficult to understand in the context of the issues before us, we do not find that this is relevant to resolving the issue at hand.

At the trial before the Commissioner, a great deal of time was consumed upon whether or not these abortions in question were medically necessary. Experts were called, and a lot of testimony produced on that issue. We do not feel, however, that we have to resolve that issue in order to resolve this claim. The Commissioner in his recommendation correctly pointed out, as above indicated, that at no time during the two years and six months from the time of the filing of this claim until the beginning of the trial did the Respondent see fit to file any pleadings, whether by way of motions, answers, or the raising of affirmative defenses. In addition, it does not appear there were any discovery procedures initiated prior to the trial beginning on August 1, 1981.

However, at the opening of the first hearing on August 1, 1981, the assistant Attorney General representing the Respondent made an oral motion for summary judgment on the grounds of the statute of limitations. The Attorney General indicated that a departmental report would be attached to such a motion for summary judgment but that it was not in their possession yet. In any event, the hearing was postponed and did not resume again until October 27, 1983.

Unfortunately, during this time the Respondent did not file a motion for summary judgment. In addition, the Attorney General did not raise the issue in its brief. However, it is clear that Public Aid claims must be filed within one year of the denial of the claim. Recently this Court decided the case of *Memorial Medical Center v. State*

(1988), 40 Ill. Ct. Cl. 73, filed February 4, 1988. In that case, Judge Poch dismissed a claim for abortion-related services because under the medical assistance program, one of the three programs involved in the Federal court litigation previously referred to, the claim was untimely in that it was filed more than one year after the date of the department's written notification that the vendor's claims were being disallowed.

While the procedure utilized by the Attorney General has been dismal in its attention to detail, it appears that they raised an extremely valid defense.

However, in addition to the statute of limitations argument, we must look at the effect of the permanent injunction on the State of Illinois and the ultimate resolution of the issues by the United States Supreme Court. There is no doubt that an injunction, while in force, should be obeyed. We believe that the State of Illinois took every effort to do exactly that, as evidenced by the documents which are attached to this opinion. As previously indicated, the various Federal courts denied motions for stay pending the final resolution of these issues by the United States Supreme Court. Therefore, it is clear that the injunction was binding and in effect for the entire time that these abortions were being performed. Illinois courts consistently held that injunction orders will be fully effective even though a notice of appeal is filed unless a stay order is issued. *Bowman Dairy Company v. Lyons* (1954), 2 Ill. 2d 625, 120 N.E.2d 1; *East Side Health District v. Village of Caseyville* (1963), 30 Ill. App. 2d 438, 187 N.E.2d 534.

In addition, the Illinois Supreme Court has held that permanent injunction, until modified or vacated, operates as a continuing adjudication which stays the actions of the defendant, and as such, that it must be obeyed until modified

or vacated, even if erroneously entered. *Bowman Dairy Company v. Lyons, supra.*

The documents attached to this opinion indicate that the Illinois Department of Public Aid intended to comply with the terms of the injunction and render appropriate payment, so long as the injunction remained in force. By the time this claim was originally presented to this Court, the injunction was no longer in force, and the constitutionality of both the Hyde Amendment and the Illinois act had been clearly established by the United States Supreme Court. It is unclear from the record before this Court whether or not the injunction was still in force at the time of the initial rejection of the claims in March 1979. But we feel that basically is irrelevant to the resolution of the issue before us. There are other means of enforcing the violation of an injunction. Evidently, the Claimant took no steps to enforce the purported violation of this injunction by appropriate remedy in the appropriate Federal court. Almost two years elapsed from the time of the initial letter of denial from the Illinois Department of Public Aid until this claim was filed before this tribunal. By the time the claim was filed, and for a considerable period of time prior to the filing of the claim, the injunction was no longer in force, and the constitutionality and validity of the applicable statutes were clearly established.

If payment had been made during the time the injunction was in force, it clearly could not have been challenged. But if payment had not been made at the time the injunction stopped being in force, and if payment had not been made at the time the constitutionality of the applicable statutes was clearly established, then we would be asking the Illinois Department of Public Aid to violate those same statutes by paying for abortions which

had violated the clear meaning of those very statutes. The Claimant is, in fact, asking us to require the State, at this late date, to violate its own law and the law of the United States of America. We do not see before us in the record of this case any theory which would justify such action. Once the injunction stopped being in force, the State was simply not required to make any further payments for abortion procedures which violated the aforesaid acts, regardless of when those abortions were performed.

We make this ruling with clear acknowledgement of the fact that stays of the injunction pending appeal were applied for and denied by both the Department and other parties. However, the Claimant did not attempt any appropriate relief to enforce the injunction in the Federal Courts before bringing this claim. The power of Federal Courts would have been more than sufficient to enforce compliance by the Illinois Department of Public Aid with the injunction while it was in effect.

As we previously indicated, we have recently dismissed a somewhat similar claim for the reason it was not brought in a timely manner. The State of Illinois has sovereign immunity, and the legislature has seen fit to establish this tribunal as a method of allowing citizens to make claims against the sovereign despite the concept of immunity. However, we are obligated by statute to follow the laws of the State of Illinois in ruling on such claims. If we were to grant a claim such as this, which violated a statute passed by the Illinois legislature, and which was ultimately upheld by the United States Supreme Court, we would be doing a great disservice to the concept of sovereign immunity. In addition, the legislature clearly established a statute of limitations for making claims by Public Aid providers. If this Court is made aware of the existence of a valid statute of limitations defense, no matter by how poor

the procedure used by the Respondent in doing so, this Court is bound to recognize the existence of such a defense and to deny the claim accordingly.

For the reasons above stated, we hereby deny this claim.

## ORDER

PATCHETT, J.

This cause comes on for hearing on Claimant's petition for rehearing and other relief filed August 13, 1990.

On August 1, 1990, the Court entered an opinion denying Claimant's claim. The opinion rendered clearly goes into all of the complex and difficult issues involved in this case. The evidence is also clear that once Claimant's claim was denied and he was informed by the Illinois Department of Public Aid of the denial, Claimant had one year from that date to file a claim with the Court of Claims. It took Claimant more than one year to file his claim in the Court of Claims.

The record indicates that the same issues advanced by Claimant in his petition for rehearing filed August 13, 1990, were raised by Claimant at the trial proceedings on August 1, 1983. At that hearing, Respondent made a belated oral motion for summary judgment raising the one-year statute of limitations on this claim. However inartfully done, the issue was brought to the Court's attention.

On August 1, 1983, counsel for Claimant made the same arguments to the commissioner that he makes in his petition for rehearing. He argued the oral motion was not timely made, that the motion for summary judgment was not made in accordance with the Civil Practice Act, that there was no notice of the motion, and no actual motion before the Court. He further argued that the oral motion

did not comply with any procedural requirements of the Court. Counsel for Claimant also argued, "If you decide to accept this affidavit, for whatever limited value it has, is really the whole crux of this case." The Claimant obviously realized that the statute of limitations was a significant issue before the Court. Claimant argued that "the whole issue is whether or not claims were submitted in a timely manner, whether they were sent back for resubmission to the DPA and whether or not these claims were properly rejected or whether they were ineligible."

Counsel for Claimant requested the commissioner not to rule on the motion for summary judgment as the motion went "to an ultimate issue of fact for the Court to determine, and there are factual issues which witnesses will testify to."

It is clear that although Respondent never filed a motion for summary judgment, that Claimant was aware of the issue on the period of limitations and that it was an issue of importance and had to be addressed with testimony. Claimant's counsel even raised the issue of rejection and recertification on August 1, 1983. Claimant's counsel argued to the Commissioner:

"So, it's not really when the claim is first denied. It's when they finally say, 'By the way, we are not paying this and that's final.'

I think this is an issue for you to determine when, at what point in time did they stop the investigation as to whether or not the claim was eligible or not and in fact deny it or at what point in time it was shown to DPA that the claim was in fact eligible and then it was subsequently paid.

I think that you'll find that all of the certificates and all of the paper was submitted in a timely manner, and I think that the evidence will show that there was correspondence—as their records show here—between DPA and my client in an attempt to straighten out this matter, and it was only at such a time that it became totally impossible to deal with the Department of Public Aid that this case in fact became possible.

So it's not that simple question of the claim was denied with this letter and then all of a sudden the statute runs. It's a more complex ° ° °."

The Commissioner stated to Claimant's counsel on August 1, 1983:

"Now, just a minute, Mr. Lapat. If the statute of limitations is in fact an issue, the fact that the Attorney General's Office perhaps sloppily has let two or so many years go by without raising it would not bar the three judges from considering that issue because the Court is an advisory committee to the legislature, and before the Court recommends to the legislature that a given amount of money be appropriated for any given claim, the Court, on its own, will consider all possible defenses, no matter how untimely raised and even if the Court has to raise the defense itself."

The Commissioner then asked for the positions of both counsel on the issue of the statute of limitations. The State took the position that the Claimant's claim was rejected on July 30, 1979. This cause was filed in the Court of Claims on January 16, 1981. The State argued that the statute of limitations was one year pursuant to Ill. Rev. Stat. (1979), ch. 23, par. 11—13. The Commissioner read the statute to Claimant's counsel and indicated to Claimant's counsel that the July 30, 1979, letter of Public Aid stated "Resubmittal of these claims will not result in payment."

Claimant argued that there were attachments to the letter of July 30, 1979, rejecting the claims and an issue of fact exists as to which claims were rejected. He also indicated that it was an issue as to whether Claimant received the rejection notice. Claimant was given the opportunity to wait for the motion for summary judgment to be filed and heard or proceed to trial. Based on the foregoing, it is not credible for Claimant to argue that the statute of limitations was an important issue in this case and that the Claimant did not have an opportunity to respond.

The trial in this case began on August 1, 1983, and extended through eight volumes of testimony. Testimony was taken for several days and into January 5, 1984, when the proofs were closed.

At the trial on January 4, 1984, Kenneth Pitman of the Illinois Department of Public Aid testified. The witness testified to certain letters of March 6, 1979, April 24, 1979, June 19, 1979, July 12, 1979, and a final letter of July 30, 1979, from the department to Dr. Klopfer. These letters, taken together with the testimony of Kenneth Pitman and Beverly Lange, were sufficient circumstantial evidence to show that the 931 claims of Dr. Klopfer were rejected no later than July 30, 1979. This case was filed in the Court of Claims on January 16, 1981.

The issue of the statute of limitations was raised and the Court believed it was raised sufficiently to deny the claim of Claimant on this jurisdictional basis. The decision of the Court had nothing to do with assuming an adversarial role or rewriting rules. The Court did not decide an unfiled summary judgment motion and did not rewrite the rules of civil procedure. The Court made a ruling on the complaint based on the issues and all of the evidence before the Court.

In reading the entire transcript and reviewing all the exhibits, it is clear that the rejection letters refer to the claims at issue in this case. While it is apparent that Claimant and his counsel abhor the Court's decision, it is a decision based on the law and evidence. The Claimant is just plain wrong when he says the statute of limitations issue was waived and that "the actions of the Court of Claims in rendering of this opinion constitute an abuse of discretion making a mockery out of judicial procedure through the Court's assumption of an adversarial position as opposed to its function as an impartial judge."

As early as 1918, this Court has consistently ruled that a State officer is without power to waive or arrest the running of the statute of limitations on a claim against the State. (*McChesney v. State* (1918), 4 Ill. Ct. Cl. 5.) This

Court has a duty to examine each case to determine that we are acting only within our jurisdiction. This is our duty and we take it seriously. It is not taking an adversarial role. The Attorney General is subject to our rules and substantive rights of the State cannot be waived by the Attorney General. *Korneder v. State* (1983), 35 Ill. Ct. Cl. 1001; *Isko Co. v. State* (1918), 4 Ill. Ct. Cl. 171.

Even though the State Attorney General has been willing to stipulate to a claim, this Court has refused to follow the stipulation and denied that part of the claim outside the statute of limitations. (*Goodwill Industries of Chicago & Cook County v. State* (1982), 35 Ill. Ct. Cl. 303.) The Court of Claims was created to adjudicate the claims against the State of Illinois on the basis of the Court's determination of the law and facts. Stipulations of the parties are not binding on the Court of Claims as agreements reached between the parties will be reviewed by the Court to determine their propriety. *Midwest Pediatric Associates v. State* (1983), 35 Ill. Ct. Cl. 765.

The statute of limitations is jurisdictional and need not be specifically pleaded. The Court may, on its own motion, dismiss a claim based on the statute of limitations. (*Illinois Bell v. State* (1981), 35 Ill. Ct. Cl. 345.) The failure to comply with the statute of limitations leaves this Court powerless to enter any award. Lack of jurisdiction can be raised at any time by direct attack or collateral attack. Since the issue was brought to the Court's attention, the Court should consider the issue. *Conley v. State* (1982), 35 Ill. Ct. Cl. 275.

Claims for vendor payments under the IDPA Medical Assistance Program have a one-year statute of limitations. (*Krakora v. State* (1987), 40 Ill. Ct. Cl. 234; *Simon v. State* (1987), 40 Ill. Ct. Cl. 247.) The Court of Claims lacks jurisdiction to consider the merits of those vendor-

payment claims which were not commenced within the time periods provided by the Public Aid Code. *Kim v. State* (1991), 43 Ill. Ct. Cl. 286; *Simon v. State* (1987), 40 Ill. Ct. Cl. 246.

This Court, in ruling on Claimant's claim, has followed its duty. Claimant had a fair trial and has been afforded due process. He just does not receive the ruling which he sought. The Court found the claim to be time-barred as an evidentiary finding. This Court has followed its precedents and found it had no jurisdiction to enter an award because of the statute of limitations time-barring the claim. The motion for rehearing and other relief is denied.