**David ZBARAZ et al.,**
**Plaintiffs-Appellees,**

v.

**Arthur F. QUERN, Defendant-Appellant.**

Nos. 78–1669, 78–1709, 78–1787, 78–1890, 78–1891 and 78–2029.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1978.

Decided Feb. 13, 1979.

**197**

William A. Wenzel, Ill. Asst. Atty. Gen., John D. Gorby, Americans United for Life Legal Defense Fund, Chicago, Ill., for defendant-appellant.

Robert W. Bennett, Chicago, Ill., Aviva Futoria, Robert E. Lehrer, Wendy Meltzer, James D. Weill, Legal Assistance Foundation of Chicago, Chicago, Ill., Lois Lipton, David Goldberger, Roger Baldin Foundation of ACLU, Inc., Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

This class action was brought under the Civil Rights Act (42 U.S.C. § 1983) to enjoin enforcement of a 1977 Illinois statute withdrawing medical assistance funding in Illinois for all abortions except those "necessary for the preservation of the life of the [pregnant] woman."[1] Plaintiffs do not object to the refusal to fund purely elective abortions, and challenge the limitation on funding only as to medically necessary abortions. They assert that the Illinois statute denies them and the classes they represent[2] rights guaranteed by Title XIX of the Social Security Act (Medicaid) (42 U.S.C. § 1396 *et seq.*) and by the Fourteenth Amendment to the United States Constitution.

Plaintiffs are two doctors whose practice includes the performance for indigent women of medically necessary abortions, most of which are not necessary for the preservation of their lives; the Chicago Welfare Rights Organization, whose members include women dependent on Illinois medical assistance benefits; and Jane Doe, an indigent woman requiring a medically necessary abortion but one that is not necessary to save her life. The principal defendant is Arthur F. Quern, Director of the Illinois Department of Public Aid, the state agency charged with administering the medical assistance programs and with enforcement of the statute in question. Two other doctors were allowed to intervene as defendants in the court below.

In December 1977 the district court issued an order abstaining from consideration of the case. Plaintiffs appealed and this Court granted them an injunction pending appeal against enforcement of the Illinois statute insofar as it prohibits state funding for therapeutic abortions.[3]

1. Ill.Rev.Stat.Supp. (1977) ch. 23 §§ 5–5, 6–1, 7–1.

2. The classes certified by the district court consist of (1) all pregnant women eligible for the Illinois medical assistance programs for whom an abortion is medically necessary but not necessary for the preservation of their lives and who wish such abortion performed, and (2) all Illinois physicians who are certified to obtain reimbursement for necessary medical services rendered to, and who perform medically necessary abortions for, persons eligible for the Illinois medical assistance programs. Because of the injunction granted below, the state resumed its prior medical assistance funding for medically necessary abortions.

3. Our injunction order defined "therapeutic" as "medically necessary or medically indicated according to the professional medical judgment of a licensed physician in Illinois, exercised in

In March 1978 we reversed the district court's abstention order but did not resolve the merits of plaintiffs' motion for a preliminary injunction. *Zbaraz v. Quern,* 7 Cir., 572 F.2d 582. Thereafter, the district court held that Title XIX of the Social Security Act and the regulations thereunder require Illinois to provide medical assistance funding for all therapeutic abortions. Judge Kirkland concluded that the Hyde Amendment on which defendants rely does not call for a contrary result.[4] Because the district court resolved the case on statutory grounds, plaintiffs' constitutional challenges were not resolved. The district court permanently enjoined defendants from denying payments under the Illinois medical assistance programs to the plaintiff physicians "and any other recognized and legal medical providers, for the rendition of medical services to indigent pregnant women for therapeutic abortions * * *." This injunction is still in effect.

This opinion starts with a caveat. This panel is interpreting Congressional and Illinois General Assembly laws as they are written. Our line of duty is to construe those laws, neither to condone nor criticize them. Moreover, we do not start with a clean slate, for six years ago the Supreme Court under the Due Process clause of the Fourteenth Amendment invalidated penal laws that restrict legal abortions to those "procured or attempted by medical advice for the purpose of saving the life of the mother." *Roe v. Wade,* 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147. Very recently the Supreme Court reaffirmed that the right to secure an abortion in the early stages of pregnancy is a fundamental right. It also stressed that the abortion decision is primarily a medical one and emphasized the central role of the physician in helping to reach that decision. *Colautti v. Franklin,* ⸺ U.S. ⸺, 99 S.Ct. 675, 58 L.Ed.2d 596. With those admonitions in mind, our task is readily charted.

The Court of Appeals for the First Circuit has recently ruled on a challenge to the Massachusetts abortion funding law that is nearly identical to the challenge mounted here to the similar Illinois law. *Preterm, Inc. v. Dukakis,* 591 F.2d 121 (1st Circuit, decided January 15, 1979). We agree with Judge Coffin's majority opinion in that case.[5]

The First Circuit held in *Preterm* that Title XIX of the Social Security Act does not require funding of all medical care which is deemed "necessary" by the treating physician, but that it does prohibit a state from singling out medically necessary abortions as a category of care which would be funded only under certain narrow circumstances. The *Preterm* court concluded that for a state so to discriminate in the care it provided would conflict with the statutory provision that state-established standards for determining the extent of medical assistance should be "reasonable" and "consistent with the objectives" of the Medicaid Act. 42 U.S.C. § 1396a(a)(17). These objectives include furnishing medical assistance "to meet the costs of necessary medical services." 42 U.S.C. § 1396. In addition, the regulations promulgated pur-

---

light of all factors affecting a woman's health." The district court employed this definition in its final judgment now here on appeal.

**4.** The Hyde Amendment (quoted *infra*) was first enacted as a rider to the FY 1977 Health, Education and Welfare appropriations bill. (Section 209 of Pub.L. 94–439; 90 Stat. 1435 Sept. 30, 1976).

**5.** Two other courts have also recently handed down opinions in similar cases. In *Roe v. Casey,* 467 F.Supp. 487 (E.D.Pa., decided December 21, 1978) the district court held that a state could not exclude medically necessary abortions as a category of care funded under Medicaid. It is not clear from the abbreviated report whether the court intended that the state pay for abortions which are medically necessary but not funded under the Hyde Amendment.

In *Frieman v. Walsh* (W.D.Mo. No. 77–4171–CV-C, decided January 26, 1979), the court similarly held that a state could not discriminate against funding medically necessary abortions under Medicaid. It did not reach the question whether the Hyde Amendment modified Title XIX, but held that even viewed as an appropriations measure, it relieved the states of the obligation of funding non-Hyde Amendment abortions because under Title XIX the states are obligated only to fund those procedures for which they will be reimbursed by the federal government.

suant to Title XIX provide that "the State may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition." 45 C.F.R. § 449.10(a)(5)(i).

■ We agree with the conclusion of. the court in *Preterm* that limiting Medicaid assistance to life-threatening abortions "violate[s] the purposes of the Act and discriminate[s] in a proscribed fashion" (slip op. 126).[6] See also *White v. Beal,* 555 F.2d 1146 (3d Cir. 1977); *Rush v. Parham,* 440 F.Supp. 383, 390–391 (N.D.Ga.1977). The First Circuit was unanimous that the Medicaid Act requires participating states to provide "medically necessary" abortions under their plans. Judge Bownes' point of disagreement with the majority was that in his view the Hyde Amendment does not permit participating states to limit necessary medical services for abortion to those set forth in that amendment. However, we agree with the conclusion of the majority in *Preterm* that the Hyde Amendment alters Title XIX in such a way as to allow states to limit funding to the categories of abortions specified in that amendment.

■ The Hyde Amendment is a provision which has been enacted in varying forms into the appropriations bills funding the Department of Health, Education and Welfare and the Labor Department for fiscal years 1977, 1978 and 1979. The fiscal 1978 and 1979 versions of it provide:

"None of the funds contained in this Act shall be used to perform abortions except when the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest have been reported promptly to a law enforcement agency or public health service, or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." (See note 4 *supra.*)

Since, like the First Circuit, we have held that Title XIX prohibits discrimination in funding based on type of condition, the Hyde Amendment by singling out abortions for funding under only certain narrowly defined circumstances is in conflict with the substantive provisions of the Medicaid Act. It therefore becomes necessary to determine whether the Hyde Amendment was intended to amend the provisions of Title XIX or merely to prohibit the expenditure of federal funds. Under the latter interpretation, the states would be obligated to provide for medically necessary abortions for which federal funds would not be available.[7]

As indicated, we agree with Judge Coffin's opinion in *Preterm* and conclude that the Hyde Amendment did amend Title XIX. We are most reluctant to conclude that Congress has used an appropriations measure to effect such a change in the law, both because this reading enhances the likelihood of confusing and disruptive annual changes in the substantive law and because the Supreme Court has recently disapproved of so interpreting an appropriations bill. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117.

---

**6.** The Massachusetts law at issue in *Preterm* limited funding to abortions "necessary to prevent the death of the mother" and to procedures "necessary for the proper treatment of the victims of forced rape or incest." 591 F.2d at 122–123. That Massachusetts law is similar to but somewhat more liberal than the Illinois statute here at issue, which provides funding only when an abortion is "necessary for the preservation of the life of the woman."

**7.** The Hyde Amendment clearly mandates abortion funding in two categories of cases not covered by the Illinois law—cases of promptly reported rape or incest, and cases in which severe and long-lasting damage to the mother's physical health would result from continuing the pregnancy. Illinois is required to fund abortions falling into these categories under its Medicaid plan and is entitled to the usual federal reimbursement. The remaining question is whether Illinois must pursuant to Title XIX provide at its own expense abortions which are medically necessary but which do not qualify for federal reimbursement under the Hyde Amendment.

The Hyde Amendment on its face refers only to the use of federal funds. The plaintiffs have asserted that the language of the Hyde Amendment itself appears clear, so that it is—theoretically at least—unnecessary to consult the legislative history. As the preceding discussion indicates, however, what the states are required to do to comply with the requirements of Title XIX is not easily determined. Although we have concluded that the states may not exclude from coverage a whole category of medically necessary care, that conclusion is not necessarily obvious from the face of any single provision of the Medicaid Act. Because not all of the obligations of the states are clearly spelled out in that statute and because those obligations arise in the context of a plan for sharing expenses between the federal and state governments,[8] it becomes appropriate to consult the legislative history of the Hyde Amendment to see what impact its provisions were intended to have on the substantive obligations of the participating states.

A fair-minded reading of the lengthy and often highly emotional floor debates in both houses of Congress during the yearly considerations of the Hyde Amendment compels the conclusion that Congress intended through this vehicle to alter the scope of Title XIX in regard to abortions. As the majority opinion in *Preterm* noted, a few Congressmen and Senators said that the amendment would simply restrict federal funds for abortions.[9] In context, however, even these remarks were apparently intended to distinguish between a prohibition on abortions (which would be unconstitutional under *Roe v. Wade, supra* ), and a mere refusal to fund abortions. They do not appear to have been intended to suggest that state—but not federal—funds would be available. Moreover no one, whether supporting or opposing the Hyde Amendment, ever suggested that state funding would be required. To the contrary, the assumption was that when federal funds were withdrawn, the states, although free to continue to pay for abortions not falling within the parameters of the Hyde Amendment, would refuse to do so.[10]

In addition, a frequently reiterated belief was that taxpayers ought not to be compelled by the federal government to finance abortions which were repugnant to them on religious or moral grounds.[11] This concern would apply with at least equal force if the tax expenditures required by federal law came from the state rather than the federal treasury. Nor is there any suggestion in the Congressional debates that the Hyde Amendment would alter the basic scheme of federal-state sharing of Medicaid expenses.[12] It is also clear that Congress was

8. 42 U.S.C. § 1396b sets out the basic scheme for partial federal reimbursement of state expenditures under Medicaid.

9. Some of these comments appear at 123 Cong. Rec.H. 6086, 6090 (June 17, 1977); 123 Cong. Rec.H. 10826–10830 (Oct. 12, 1977); 123 Cong. Rec.S. 11039 (June 29, 1977).

10. Comments revealing that assumption appear throughout the debates, but a sample of them can be found at 123 Cong.Rec.H. 6085 (Rep. Bauman); *id.* at 6086 (Rep. Stokes); *id.* at 6088 (Rep. Eckhardt); *id.* at 6089 (Reps. Fenwick and Spellman); *id.* at 6092 (Rep. Holtzman); *id.* at 6093 (Reps. Weiss and Allen) (June 17, 1977); 123 Cong.Rec.H. 10968 (Rep. Sears) (Oct. 13, 1977); 123 Cong.Rec.S. 18583–84 (Sen. Bayh); *id.* at 18589 (Sen. Packwood) (Nov. 3, 1977); 123 Cong.Rec.S. 13672 (Sen. Brooke) (Aug. 4, 1977); 123 Cong.Rec.S. 11040 (Sen. McGovern) (June 29, 1977).

11. Samples of these remarks appear at 123 Cong.Rec.H. 6085 (Rep. Obey); *id.* at 6088 (Rep. Rudd); *id.* at 6089 (Rep. Young) (June 17, 1977); 123 Cong.Rec.H. 10835 (Rep. Early) (Oct. 12, 1977); 123 Cong.Rec.S. 18584–18585 (Sen. Helms) (Nov. 3, 1977).

12. Plaintiffs have correctly noted that Medicaid and related statutes sometimes do require state expenditures unmatched by federal funds (Br. at 63–64, note). We have no doubt of Congress' authority to condition its expenditure of Medicaid funds on the states' expenditure of funds for related purposes. However, as plaintiffs' examples indicate, when Congress has imposed such conditions, it has done so explicitly and for the apparent purpose of encouraging the states to undertake programs Congress deemed to be desirable. Not only did Congress not explicitly shift the funding obligation to the states in the Hyde Amendment, but it also clearly did not intend to encourage abortions.

aware that its action could be construed as legislation via an appropriations bill,[13] and that this was not the preferred method of procedure.[14]

Finally, the circumstances under which the Hyde Amendment was passed distinguish it from *Tennessee Valley Authority v. Hill, supra.* The problems the Supreme Court faced when asked to construe the appropriations for the TVA budget, including the Tellico Dam, as effecting a *pro tanto* repeal of the Endangered Species Act do not exist here. Unlike the situation in the *Hill* case, there is no question here that Congress as a body was well aware of the implications of the Hyde Amendment and agreed to them. More importantly, *Hill* involved the question of when expenditures authorized under one Act should be inter-

preted to repeal the substantive provisions of an entirely independent Act.[15] Here, in contrast, not only was the appropriations measure geared specifically to the substantive provisions of the affected Act, but the amendment was in the form of limiting previously authorized expenditures rather than authorizing arguably prohibited expenditures, as in *Hill.*

■ Under these circumstances, mindful that "[t]he doctrine disfavoring repeals * * applies with even *greater* force when the claimed repeal rests solely upon an appropriations act,"[16] we are nonetheless convinced by the overwhelming weight of the legislative history that Congress did intend to alter the substantive requirements of Title XIX by passing the Hyde Amend-

---

**13.** We do not rely on the fact that both the House and the Senate waived their rules against legislating in an appropriations bill (House Rule XXI(2); Standing Rules of the Senate, Rule 16.4) in concluding that the Hyde Amendment worked a substantive change in the law. Apparently both houses of Congress interpret those rules to mean that while a limitation on expenditures would be acceptable, any provision which imposed a duty on federal officials would go beyond a limitation and run afoul of the rules. See 123 Cong.Rec.H. 6082 (June 17, 1977). Because ascertaining when the conditions of the Hyde Amendment would be fulfilled was interpreted to impose additional duties on federal officials, only a flat ban on the use of funds for abortions was construed to be within the rules. It was in order to allow federal funds for abortions in certain limited circumstances that the rules were waived. Since a flat ban on abortion funding, although evidently within the procedural rules, would nevertheless conflict with our interpretation of Title XIX, the fact that the rules were waived, although relied upon by the defendants, is not helpful.

**14.** Early in the debate on the fiscal 1978 appropriations, Congressman Hyde spoke as follows:
"Yesterday, remarks were made that it is unfortunate to burden an appropriation bill with complex issues, such as busing, abortion and the like. I certainly agree that it is very unfortunate. The problem is that there is no other vehicle that reaches this floor in which these complex issues can be involved. Constitutional amendments which prohibit abortions stay languishing in subcommittee, much less committee, and so the only vehicle where the Members may work their will,

unfortunately, is an appropriation bill. I regret that. I certainly would like to prevent, if I could legally, anybody having an abortion, a rich woman, a middle-class woman, or a poor woman. Unfortunately, the only vehicle available is the HEW medicaid bill. A life is a life. The life of a little ghetto kid is just as important as the life of a rich person. And so we proceed in this bill."
123 Cong.Rec.H. 6083 (June 17, 1977). Subsequently, numerous other Congressmen and Senators, both opponents and proponents of the bill, indicated awareness that the amendment would have a substantive impact. See e. g., 123 Cong.Rec.H. 6088 (Rep. Eckhardt); *id.* at 6090 (Rep. Mazzoli); *id.* at 6097 (Rep. Meyner) (June 17, 1977); 123 Cong.Rec.S. 11035 (Sen. Brooke) (June 29, 1977); 123 Cong.Rec.S. 19440, 19441 (Sen. Magnuson); *id.* at 19443 (Sen. Javits); *id.* at 19445 (Sen. Stennis) (Dec. 7, 1977).

**15.** As the Supreme Court noted, implying such a repeal could wreak havoc with the legislative process.
"When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure."
*Tennessee Valley Authority v. Hill,* 437 U.S. at 190, 98 S.Ct. at 2300.

**16.** *Tennessee Valley Authority v. Hill,* 437 U.S. at 190, 98 S.Ct. at 2300.

ment.[17] Therefore Illinois is not required by Title XIX to fund abortions other than those covered by the Hyde Amendment.

As noted, the district court did not reach the constitutional arguments raised by the parties because it had statutory grounds for its decision. Because the constitutional issues were not considered below, and in light of the fact that our interpretation of the Hyde Amendment to modify the requirements of Title XIX may alter the constitutional considerations, it would be inappropriate for us to pass on them now. The parties should have a full opportunity to develop their positions and the district court to rule on them. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826. Therefore, we remand the case for expedited consideration of the constitutional questions that remain open. This consideration should include, *inter alia,* whether the Hyde Amendment, by limiting funding for abortions to certain circumstances [18] even if such abortions are medically necessary, violates the Fifth Amendment in view of the facts that no other category of medically necessary care is subject to such constraints and that abortion has been recognized as a fundamental right. *Roe v. Wade, supra.*

On remand, the permanent injunction granted by the district court must be modified forthwith to require defendants to grant payments to plaintiff physicians and other recognized and legal medical providers for the rendition of medical services to indigent pregnant women for those abortions fundable under the Hyde Amendment. The defendants have pointed out that the challenged Illinois law applies to medical care under fully state-funded plans as well as under Medicaid (Ill.Rev.Stat. ch. 23 §§ 6–1 and 7–1; General Assistance and Local Aid to the Medically Indigent, respectively). Therefore, they assert, since the Illinois statute has so far been determined only to contravene Title XIX as altered by the Hyde Amendment, enforcement of the Illinois statute should not be enjoined as it applies to purely state-funded plans. The plaintiffs urge us to find the statute non-severable, so that its application to purely state-funded plans falls with the federally funded portion.[19]

This presents a close question that necessitates interpreting what the Illinois General Assembly would likely have done had it been able to foresee the development of this case.[20] In a similar situation the Illinois Supreme Court has held a law non-severable (*Sperling v. County Officers Electoral Board,* 57 Ill.2d 81, 309 N.E.2d 589 (1974)), whereas in others it has not (*Vissering Mercantile Co. v. Annunzio,* 1 Ill.2d 108, 115 N.E.2d 306 (1953); *People ex rel. Engle v. Kerner,* 32 Ill.2d 212, 205 N.E.2d 33 (1965)).

17. It is established that Congress has the power to legislate substantively in an appropriations Act. *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356. Moreover, when as here the substantive change is a prohibition against the use of funds for previously authorized purposes, the courts have been less hostile to modifications via appropriations bills. *Eisenberg v. Corning,* 86 U.S.App.D.C. 21, 179 F.2d 275, 276 (1949); *Friends of the Earth v. Armstrong,* 485 F.2d 1, 9 (10th Cir. 1973), certiorari denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120; *City of Los Angeles v. Adams,* 181 U.S.App.D.C. 163, 556 F.2d 40, 48–49 (1977).

18. The constraints imposed by the Hyde Amendment on medically necessary abortions which are not imposed on other kinds of medically necessary care include (1) a greater degree of potential harm from withholding treatment (the threatened damage in the case of an abortion must be "severe and long-lasting"), (2) the threatened harm must be physical, and (3)

two doctors must make the determination of likely harm.

19. The defendants suggest that we should not consider the severability issue since the district court did not articulate this ground for its decision. However, we may affirm a district court's ruling which is correct as a matter of law even though the proper ground was not expressed. Therefore cases cited by defendants to the effect that an appellate court will not consider a ground for reversal which was not presented to the district court are inapposite.

20. The Illinois Supreme Court has formulated the test for severability of provisions of a law as whether "it can be said that the General Assembly would not have passed the statute with the invalid portion eliminated." *People ex rel. Engle v. Kerner,* 32 Ill.2d 212, 221–222, 205 N.E.2d 33, 39 (1965).

We have been told that the vast majority of publicly funded abortions would come under the Medicaid plan rather than the purely state plans. In these circumstances, it is not at all clear that the General Assembly would have imposed standards for funding from state plans which differ from the standards for Medicaid funding. The defendant State's official has informed us that the Illinois law "represents Illinois' understanding of Congressional purpose as reflected in the Hyde Amendments to federal welfare appropriations and the Supreme Court's delineation of the nature and extent of the qualified 'right' to abortion vis-a-vis the public funding issue * * *" (Br. 9).[21] Since the State itself has tied the challenged statute to the proper interpretation of what is required by Title XIX, evidently it intended that recipients of purely state funds be treated consistently with those who receive Medicaid funds.

In light of this history of the challenged law, and in view of the fact that the resolution of the constitutional issues will apply equally to the state-funded and the Medicaid-funded plans,[22] we conclude that the various provisions of the law should not be severed and that the modified injunction should apply to all publicly funded abortions.

Vacated and remanded for further proceedings consistent herewith.[23]

---

**21.** When the Illinois law was passed, the version of the Hyde Amendment then in effect (fiscal year 1977) provided funds for abortions only when the life of the mother was endangered.

**22.** If the Hyde Amendment is determined to violate the guarantee of equal protection as it inheres in the Due Process clause of the Fifth Amendment, it appears likely that similar state action would violate the Fourteenth Amendment.

**23.** Our mandate shall issue this day.