**WOMEN'S HEALTH SERVICES, INC., et al.**

v.

**Edward MAHER et al.**

Civ. No. H–79–405.

United States District Court,
D. Connecticut.

Jan. 7, 1980.

---

Martha Stone, Conn. Civil Liberties Union, Hartford, Conn., Catherine G. Roraback, Canaan, Conn., for plaintiffs.

Michael A. Arcari, Paige Everin, Asst. Attys. Gen., Hartford, Conn., Cheryl B. Wattley, Asst. U. S. Atty., New Haven, Conn., Brian N. Smiley, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

Connecticut's Medicaid program makes payment for abortion services only when, "[o]n the basis of his professional judgment, the attending physician has certified in writing that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term." 3 Dep't of Income Maintenance, *Medical Assistance Program Manual,* ch. III, § 275 (Sept. 1, 1977) [hereinafter section 275]. This action was filed on July 17, 1979, challenging section 275 on both statutory and constitutional grounds. Jurisdiction is founded upon 28 U.S.C. § 1343 (1976), and this court's pendent jurisdiction, *see Hagans v. Lavine,* 415 U.S. 528, 543–45, 94 S.Ct. 1372, 39 L.Ed.2d. 577 (1974).[1]

The named plaintiffs are a non-profit New Haven clinic providing pregnancy termination services, an indigent pregnant woman who sought an abortion for medically necessary reasons, and two physicians who concurred in the medical judgment that an abortion was necessary to preserve her health. The case was certified on the day it was filed as a class action to include all indigent pregnant women in Connecticut seeking state medical assistance for a medically necessary abortion and all physicians who are certified to and treat as patients Medicaid-eligible women. Defendant Edward Maher, Commissioner of the Connecticut Department of Income Maintenance, is the state official responsible for the promulgation and enforcement of section 275. De-

---

1. Had the plaintiffs not raised a constitutional claim, the court might have no jurisdiction to consider their statutory arguments alone. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 618–623, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

fendant Henry Parker is the State Treasurer, with authority over the disbursement of state monies.

A temporary restraining order has been in effect since July 17, 1979, prohibiting the defendants from enforcing section 275 and requiring them to provide reimbursement to certified physicians for all medically necessary abortions performed on Medicaid-eligible women. A hearing was conducted on October 19, 1979 on the plaintiffs' motion for a preliminary injunction, at the conclusion of which all parties agreed to a consolidation with the hearing on the merits under Fed.R.Civ.P. 65(a)(2). The case is thus ripe for final decision.

The central issue is easily stated: Must Connecticut provide Medicaid reimbursement for all medically necessary, *i. e.* therapeutic, abortions performed on indigent pregnant women either under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396k (1976 & Supp. I 1977), or under the Constitution? Regrettably, the question admits of no simple answer. The issues presented on the statutory branch of the case are purely legal ones, and so I will consider those before making any findings of fact that might be necessary to a constitutional decision.

### The Statutory Claims

The Supreme Court in *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), summarized the purpose and general structure of the Medicaid program as follows:

> "Title XIX establishes the Medicaid program under which participating States may provide federally funded medical assistance to needy persons. The statute requires participating States to provide qualified individuals with financial assistance in five general categories of medical treatment. 42 U.S.C. §§ 1396a(a)(13)(B) (1970 ed., Supp. V), 1396d(a)(1)–(5) (1970 ed. and Supp. V). Although Title XIX does not require States to provide funding for all medical treatment falling within the five general categories, it does require that state Medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX].' 42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V)."

432 U.S. at 440–41, 97 S.Ct. at 2368–2369 (footnotes omitted).

Connecticut's Medicaid plan, which pays for abortions necessary to save the life of the mother but not those necessary to preserve her health, is assailed by the plaintiffs as running afoul of Title XIX and its accompanying regulations. Primary reliance is placed on the contention that the federal statute requires the state to provide coverage for "*all* 'necessary medical services.' " Plaintiffs' Supplemental Brief at 9 (emphasis in original). The argument is not unattractive. One objective of Title XIX is to furnish medical assistance to those "whose income and resources are insufficient to meet the costs of *necessary medical services,*" 42 U.S.C. § 1396(1) (1976) (emphasis added), and the "standards . . . for determining . . . the extent of medical assistance under the [state] plan" must be consistent with that objective, *id.* § 1396a(a)(17). Were Title XIX read to require payment for all medically necessary services, the state regulation would certainly have to be struck down as inadequate. On closer analysis, however, this reasoning proves more seductive than supportable.

The statute's reference to "necessary medical services" must be read in context. Section 1396 describes the *persons eligible* for Medicaid assistance as those "whose income and resources are insufficient to meet the costs of necessary medical services." The *services* for which Medicaid payments are available are described in section 1396d(a)(1)–(17) and while quite comprehensive in nature, that section does not read in terms of necessity. A number of district courts, perhaps in an effort to avoid difficult constitutional problems, have held

that Title XIX obligates the states to provide for all necessary medical services.[2] *E. g., Doe v. Busbee,* 471 F.Supp. 1326, 1330–31 (N.D.Ga.1979); *Roe v. Casey,* 464 F.Supp. 487, 500 (E.D.Pa.1978); *Smith v. Ginsberg,* Civil No. 75–0380 CH, slip op. at 3 (S.D.W.Va. May 9, 1978). The one court of appeals to face and analyze the question squarely, however, has reached an opposite conclusion. *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 124–25 (1st Cir. 1979) (majority opinion), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979). The Second Circuit, too, has been careful in the past to distinguish between the statute's description of persons eligible for assistance and those services for which payments are available. In *Roe v. Norton,* 522 F.2d 928 (2d Cir.), *on remand,* 408 F.Supp. 660 (D.Conn.1975) (3-judge court), *rev'd sub nom. Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), a nontherapeutic abortion case, the court noted, "The broad classifications of the types of care and services authorized by § 1396d do not include a 'medical necessity' requirement. . . . We find no such requirement elsewhere in the statute." *Id.* at 933 (citation omitted). The careful reasoning on this point in *Preterm* and the Second Circuit's statement in *Norton* persuade me that Title XIX does not require state plans to cover all necessary medical services.

■ The statutory questions in this case are not exhausted by so holding, however. The district courts have been nearly unanimous in concluding that a state restriction on funding for medically necessary abortions contravenes one or more of the plan-content requirements found in Title XIX and its accompanying regulations,[3] which of

course have the force of law. *Planned Parenthood Affiliates v. Rhodes,* 447 F.Supp. 529, 537 (S.D.Ohio 1979); *Hodgson v. Board of County Commissioners,* No. 4–78 Civ. 525, slip op. at 8 (D.Minn. July 13, 1979); *Doe v. Busbee, supra,* at 1330 n. 9; *Roe v. Casey, supra,* at 500–02; *Smith v. Ginsberg, supra,* at 3; *see Doe v. Kenley,* 584 F.2d 1362, 1366 (4th Cir. 1978). *Contra, D. R. v. Mitchell,* 456 F.Supp. 609, 616–26 (D.Utah 1978), *appeal docketed,* No. 78–1675 (10th Cir. 1978). While these courts thus struck down the challenged state restrictions on statutory grounds, the First and Seventh Circuits did not. *Zbaraz v. Quern,* 596 F.2d 196, 199–202 (7th Cir. 1979); *Preterm, Inc. v. Dukakis, supra,* at 127–34. They held, instead, that the Hyde Amendment[4] substantively modifies the requirements of Title XIX with respect to those abortions not excepted by the Amendment.

In its fiscal 1978–1979 embodiment, the Hyde Amendment provided in pertinent part:

"[That] none of the funds provided for in this paragraph shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly to a law enforcement agency or public health service; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians."

Act of Oct. 18, 1978, Pub.L.No. 95–480, § 210, 92 Stat. 1567; Act of Dec. 9, 1977,

---

2. Some of these courts have drawn guidance from a dictum in *Beal v. Doe, supra,* that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." The question is serious indeed, as the diversity of views among lower courts on the subject indicates. But the question was not before the Court in *Beal* and given the multiplicity of viewpoints

expressed since, I hesitate to read the Court's dictum as foreshadowing an answer.

3. These requirements are found in 42 U.S.C. § 1396a(a)(10)(B), (C)(ii), (17), (19) (1976), and 42 C.F.R. §§ 440.230(b)–(c), .240, .260 (1978).

4. The Hyde Amendment is the name given to the riders that have been tacked on to the

Pub.L.No. 95–205, § 101, 91 Stat. 1460.[5] The courts holding that Hyde does not modify the states' Title XIX obligations have generally taken a "plain meaning" approach to the language of the rider and concluded that it affects only federal appropriations, not Title XIX. The *Preterm* majority and *Zbaraz* court have been criticized for resorting to an analysis of legislative history when the language of the Hyde Amendment is so "plain." In my view, however, it strains credibility to insist that the meaning and purpose of the rider are so clear that a court is forbidden to examine the relevant legislative history. As the *Preterm* majority explained:

> "The construction urged by the plaintiffs would result in imposing an obligation on the states to fund the total cost of non-Hyde Amendment therapeutic abortions, *a result not consonant with the basic policy of the Medicaid system* under which the federal government participates in the funding of medical services provided by the states."

591 F.2d at 128 (emphasis added). Under these circumstances, the use of legislative history cannot be forbidden as an aid to construction. *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1939).

The First Circuit, after lengthy analysis of legislative history and careful consideration of the Hyde Amendment's relationship to Title XIX, held:

> "[T]he Amendment constituted a substantive policy decision concerning the public funding of abortions which left the states free to fund more abortions than those for which federal funds were made available by the Amendment, but did not require them to do so. The Medicaid Act, to the extent of its repugnancy with the Hyde Amendment, has therefore been altered by the Amendment."

591 F.2d at 134. Chief Judge Coffin's exhaustive and careful analysis obviates the need for me to undertake the same. The Seventh Circuit has expressed its agreement with *Preterm* on this point, as well. *Zbaraz v. Quern, supra,* at 199. I concur with the conclusions of those courts of appeals.

Connecticut's regulation, however, is more restrictive in its coverage than even the Hyde Amendment. Federal funds have been available to Connecticut in the past for abortions necessary to prevent severe and long-lasting physical health damage to the mother and to terminate the pregnancies of rape or incest victims, as well as to save the life of the mother, but the state has chosen to avail itself of federal funds only for this last purpose.[6] By failing to provide Medicaid reimbursement for those

Department of Health, Education and Welfare's appropriations bills since fiscal year 1977.

5. On November 20, 1979, Public Law No. 96–123, providing HEW appropriations for fiscal year 1980, was enacted into law. Section 109 of that Act revised the Hyde Amendment by eliminating the provision for federal reimbursement in the case of abortions necessary to prevent severe and long-lasting physical health damage to the mother.

6. In *Beal v. Doe, supra,* the Supreme Court held that Title XIX did not obligate the states to fund "nontherapeutic" abortions. 432 U.S. at 447, 97 S.Ct. 2366. The defendants attempt to broaden the scope of *Beal*'s holding by arguing that the term "nontherapeutic" includes all abortions except those necessary to save the mother's life. Defendants' Brief at 16, 31. This reading is most certainly at odds with the facts of *Beal* itself. In that case, Pennsylvania's regulations limited Medicaid assistance "to those abortions that [were] certified by

physicians as medically necessary," 432 U.S. at 441, 97 S.Ct. at 2369, and in interpreting the meaning of those regulations the Court adopted *the standard of medical necessity employed in Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973):

> "[T]he medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman."

*Id.* at 192, 93 S.Ct. at 747. That *Bolton* was a *criminal case is of no consequence.* It should also be noted that the terms "therapeutic" and "medically necessary" are used interchangeably in this opinion.

few medically necessary abortions for which federal funds were available and as to which Title XIX was not altered,[7] Connecticut may have discriminated against eligible recipients "solely because of the diagnosis, type of illness, or condition," in violation of 42 C.F.R. § 440.230(c)(1) (1978), and failed to provide care "in a manner consistent with . . . the best interests of the recipients," in violation of 42 U.S.C. § 1396a(a)(19) (1976), "because it focuse[d] upon the variety of illness or the severity of the patient's condition as the benchmark for deciding whether to allow reimbursement," *Curtis v. Page*, Civil No. TCA 78–07, slip op. at 6 (N.D.Fla. Apr. 18, 1979). *See Preterm, Inc. v. Dukakis, supra,* at 134; *Planned Parenthood Affiliates v. Rhodes, supra,* at 537; *Hodgson v. Board of County Commissioners, supra,* at 8; *Doe v. Busbee, supra,* at 1330 n. 9; *Roe v. Casey, supra,* at 501–02; *Smith v. Ginsberg, supra,* at 3.

█ But the recent revision of the Hyde Amendment for fiscal year 1980, *see* note 5 *supra,* creates a procedural problem for the plaintiffs here. Pursuant to the temporary restraining order entered in this case on July 17, 1979, any physician who since that time performed an abortion necessary to prevent severe and long-lasting physical health damage to a Medicaid patient has been paid for his services. Yet states may *now* refuse to pay for such abortions without violating Title XIX. A permanent injunction requiring the state to fund any medically necessary abortion for which federal reimbursement is presently available would therefore be meaningless, and "a court of equity will not do a useless thing." *New York Times Co. v. United States,* 403 U.S. 713, 744, 91 S.Ct. 2140, 2157, 29 L.Ed.2d 822 (1971) (Marshall, J., concurring). Therefore, the plaintiffs' final statutory claim—that the state must fund those medically necessary abortions exempted by the Hyde Amendment—has been mooted by

the expiration of fiscal year 1979 and revision of the Hyde Amendment for fiscal 1980. *See Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam).

### The Equal Protection Claim

Having concluded that the requirements of Title XIX are altered by the Hyde Amendment, it becomes necessary to consider whether Connecticut's regulation prohibiting payment for therapeutic abortions violates the Constitution. The plaintiffs charge that section 275 violates the first, fourth, fifth, ninth, and fourteenth amendments, but place primary emphasis on the last claim—specifically, on the equal protection clause. With respect to the constitutional branch of this case, I make the following findings of fact upon the testimony presented at the hearing and the exhibits offered in evidence:

Section 275 provides Medicaid reimbursement to physicians who perform abortions meeting the "life-endangering" standard set forth therein. Through their medical experts, the plaintiffs established that such a standard does not account for the vast complexity of medical problems that arise in pregnancy and that may make an abortion medically necessary. These problems are not confined to those which may cause severe and long-lasting physical health damage if the fetus is carried to term. On the contrary, there are many conditions, both physiological and psychological, that may indicate the need for a therapeutic abortion yet are neither life-endangering nor severely threatening to a woman's long-term physical health. Tr. 13–15, 90–91.

Among the conditions that may make an abortion medically necessary are all autoimmune diseases (rheumatic arthritis, multiple sclerosis, lupus, etc.); chronic heart, liver, and kidney diseases; chronic anemia;

---

**7.** At the hearing, the defendants attempted to demonstrate that they have "updated" their policy in order to provide payment for abortions performed on rape and incest victims. Deft.'s Exhibit B–1; Transcript (Tr.) at 164–66. On cross-examination, however, the defendants' witness, Stephen Press, Director of Medical Care Administration, Department of Income Maintenance, admitted that the updated policy has "never been distributed," although it was approved by HEW. Tr. 180.

diabetes; phlebitis; toxemia (high blood pressure coupled with fluid retention, progressing to convulsions and sometimes death, particularly among young persons); hypertension; severe stress; schizophrenia; biological depression; and dependence on psychoactive and other medication. Tr. 13–14, 20–25, 89–95, 101, 187–94. The Department of Health, Education and Welfare has compiled a thorough, though not exhaustive, list of 21 conditions that may indicate, under certain circumstances, the medical necessity for an abortion.[8] Pl.'s Exhibit 11. In some cases, a mother's knowledge of likely fetal deformity, retardation, mortality, or morbidity generates such anxiety that an abortion becomes a medical necessity to preserve the mother's psychological health. Tr. 25, 30–31, 94–95, 187–94. Pregnancies in women suffering from any of these conditions cannot be termed "normal" pregnancies, nor can childbirth in such women be termed "normal" either. Tr. 26, 32.

The medical indications for abortion occur with frequency among indigent women, Tr. 26, and the likelihood of their occurring *concurrently* is higher among poor women than among the suburban population. Tr. 102–03. As a result, Connecticut's regulation has the effect of denying Medicaid assistance to precisely those women who as a *medical* matter are most in need of it. Of approximately 144 indigent patients counseled in the first six months of this year by the plaintiffs' witness, Helen Ann McLendon, a health educator at Community Health Services in Hartford, nearly 37% were unable to raise the funds needed to pay for medically necessary abortions and were thus forced to carry their abnormal pregnancies to term.[9] Tr. 60–62. Of these 144 individuals, approximately 7% were able to raise the $175 typically charged for a first trimester abortion,[10] but by that time had already passed into the second trimester, during which abortions typically cost $800, a sum they could not possibly amass. Tr. 58, 61–62. The problem is compounded by the tendency of indigent women to seek abortions at a somewhat later date than patients with insurance or other resources, thus drawing them even closer to the second trimester.[11] Tr. 33, 74–75, 96–98. Because these indigent women who must carry a fetus to term do not enjoy "normal" pregnancies or childbirths, they will need even more medical care, service, and monitoring than would otherwise be necessary. Tr. 67, 76, 79. Indeed, the defendants' medical expert testified that a sub-specialty in the field of obstetrics and gynecology has grown up, known as perinatology, which deals primarily with treatment of the high-risk pregnant patient. Tr. 133. Nevertheless, in some cases, additional illness or even sudden death may result. Tr. 13–14, 21–23, 101.

These factors combine to produce a peculiarly unfortunate situation for the attending physician. Medicaid-eligible patients are more likely to need therapeutic abortions than non-indigent patients. Although Connecticut will pay for most every obstetric and gynecological service conceivable, a doctor who believes that an indigent patient requires a therapeutic abortion will find the exercise of his or her best professional judgment frustrated by the refusal of clinics and hospitals to admit an indigent for whom Medicaid reimbursement will not be available. As the plaintiffs' witness, Dr. David Bingham, aptly put it, at Tr. 95–96:

---

8. The defendants' medical expert, Dr. Victor Fortin, conceded that there were some medical conditions that "absolutely" would require an abortion, Tr. 142, "[w]ithout regard to an immediate or even somewhat remote likelihood of causing death if uncorrected," Tr. 144.

9. The remaining 63% were able to obtain funds to pay for therapeutic abortions, but only with some sacrifice—not paying rent or utility bills, pawning household goods, diverting food and clothing money, or journeying to another state to obtain lower rates or fraudulently use a relative's insurance policy. In a few cases, some patients were driven to theft. Tr. 61–66, 96.

10. By contrast, the total cost to the Medicaid system of prenatal, delivery, and post-partum care is $1,390.50. Pl.'s Exhibit 4.

11. The risk of death from a second trimester abortion is 15 to 20 times higher than from a first trimester abortion.

"My job as a physician is to protect a woman's health. And when I am given the limitation that I am only allowed to treat her to save her life, this is a direct infringement upon my practice of treating these patients who are poor and who do. not have the funds to protect their health.

"The medically—

"THE COURT: Well, you're not prevented from treating the patient, Doctor.

"THE WITNESS: I'm prevented if she is unable to get into the hospital for her procedure because the hospital requires funding and the patient cannot obtain these funds for hospitalization.

"I'm prevented from—

"THE COURT: All right. The hospital facilities are unavailable without funds.

"[THE WITNESS:] So that the frustration of all your years of training and your advice to a patient as what will be best, your best medical approach to her care, is being thwarted by a government position that it will pay all the benefits if she decides to have the baby, even if it may mean a permanent health disability, and to see them make a choice of having a child at greater risk to her health."

Obviously recognizing this professional dilemma, the major organizations with concerns in this area—the American Medical Association, American College of Obstetrics and Gynecology, and Connecticut's own Statewide Health Coordinating Council—have all expressed their opposition to legislation that denies funding for indigent women who need therapeutic abortions.[12] Pl.'s Exhibits 1, 8.

I now proceed to analysis of the plaintiffs' equal protection claims in light of the foregoing facts.

Connecticut, in establishing a program that provides funding for certain categories of medical care, must do so in a manner that comports with constitutional limitations. *Maher v. Roe, supra,* 432 U.S. at 469–70, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *see Lady Jane v. Maher,* 420 F.Supp. 318, 321 (D.Conn.1976) (3-judge court), *summarily aff'd sub nom. Maloney v. Lady Jane,* 431 U.S. 926, 97 S.Ct. 2628, 53 L.Ed.2d 242 (1977). All legislation and regulation involves line-drawing, but the state may not draw a line around therapeutic abortions, while funding all obstetric and gynecological services other than abortion, if to do so would violate the equal protection clause. In *Maher v. Roe, supra,* the Supreme Court held that Connecticut did not violate equal protection by refusing to fund *nontherapeutic, i. e.* elective, abortions. The essence of the *Maher* Court's analysis was that the challenged regulation did not impinge on

---

**12.** Defendants attempted at the hearing to prove that there is no standard for "medical necessity" that would enable the state to know what it was paying for in the event its regulation were struck down. This issue is a red herring. *Doe v. Bolton, supra,* provides whatever legal standard the state needs. *See* note 6 *supra.* And as a medical matter, the standard is "preserving the health of the woman." Tr. 110.

The defendants' sole medical witness, Dr. Fortin, was at best inconsistent on this point. After testifying on direct examination that there was no standard for medical necessity, Tr. 132, he testified as follows on cross-examination:

Q  Are there any circumstances under which you, yourself, would recommend to a woman that she should have an abortion, Doctor?
A  I have recommended women when I was in private practice, I sent several women for abortions, yes.
Q  And do you recognize medically necessary conditions—
A  Absolutely.
Q  —that would require an abortion?
A  No question in my mind.
Q  So that there are some medically necessary standards?
A  Absolutely. You're right.
Q  And under those circumstances you would think that an abortion was appropriate medical procedure?
A  No question in my mind.
Tr. 142.

Of course, even had Dr. Fortin been consistent in his answers, the state's position would be entitled to little weight. The defendants produced no evidence that they ever had difficulty applying the "medical necessity" standards upheld in *Maher v. Roe, supra,* 432 U.S. at 466 n. 2, 97 S.Ct. 2376 nor in applying the same standard as required by the temporary restraining order issued in this case last July.

the fundamental right of personal privacy, which was held in *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to encompass a woman's decision to terminate her pregnancy.[13] Connecticut's regulation "place[d] no obstacle—absolute or otherwise—in the pregnant woman's path to an abortion," 432 U.S. at 474, 97 S.Ct. at 2382, and furthered the state's legitimate interest in "encouraging normal childbirth." *Id.* at 479, 97 S.Ct. 2376. With a " 'reasonable basis' for the classification" thus shown, the Court rejected the plaintiffs' constitutional challenge. *Id., quoting Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Connecticut has since amended its Medicaid regulations, obviously seeking to stretch its restrictions on abortion funding to the legal limits. Defendants argue that their current section 275 survives the instant challenge for the same reasons their earlier regulations were upheld in *Maher*. They fail to acknowledge, however, the serious differences between the consequences of their present position and those of the *Maher* decision, which as a matter of public policy may justify a different result. As a purely practical matter, and as the facts demonstrate, the indigent woman's health is most certainly at stake in this case, though it was not in *Maher*. There was no question that the woman who desired an abortion in *Maher* could sustain a normal pregnancy and a normal childbirth if her fetus were carried to term; the opposite is true here. In *Maher*, the state took a neutral stance toward a protected activity (abor-

tion) while encouraging another, equally legitimate choice (childbirth), with no positive detriment accruing to the woman who ultimately opted for childbirth; the legitimacy of the state's favored alternative in the instant case is open to question, however, because it is not merely unattractive but dangerous to the woman who cannot find the funds for an abortion. *Maher*, therefore, hardly provides a perfect analogy to the problem now before this court. *See generally* Note, *Abortion, Medicaid, and the Constitution*, 54 N.Y.U.L.Rev. 120, 127–30, 137–47 (1979).

■ Despite these differences, I am unable to discern the existence of a fundamental right so impinged upon by the challenged regulation as to justify strict scrutiny under the equal protection clause. Whether the fundamental right of privacy or the right of the physician to treat a patient is invoked, *Maher* forecloses the argument that the denial of government benefits "places [an] obstacle . . . in the pregnant woman's path to an abortion. . . . The State . . . has imposed no restriction on access to abortions that was not already there." [14] *Maher v. Roe, supra,* 432 U.S. at 474, 97 S.Ct. at 2383. The plaintiffs urge the court to find an impingement on a woman's fundamental interest in preserving her own health. No such interest has been explicitly recognized by the Supreme Court, but even if there is one, the plaintiffs are unable to climb the next hurdle—demonstrating that section 275 imposes a restriction on the preserva-

---

13. The "constitutional right to seek an abortion" was recently reaffirmed in *Bellotti v. Baird*, —— U.S. ——, ——, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (Powell, J., for 4 Justices); *id.* at ——, 99 S.Ct. 3035 (Stevens, J., for 4 Justices).

14. In *Doe v. Percy*, 476 F.Supp. 324, 333 (W.D. Wis.1979), on a motion for a preliminary injunction raising the same issue, Judge Doyle held that the plaintiffs enjoyed "a strong probability of ultimate success in this lawsuit in their contention that when evaluated against the choice-influencing classification embodied in Wis.Stat. § 20.297, the interest of plaintiff Doe in freedom to choose whether to terminate her pregnancy is fundamental, that the classifica-

tion must be subjected to strict scrutiny, and that the classification can be upheld only if justified by a compelling governmental interest."

The court's holding was apparently predicated on the belief that the importance of the woman's right to choose varies from case to case "depending upon the consequences to a particular woman *if abortion is removed from the choice.*" *Id.,* at 333. If the *Maher* Court made anything clear, however, it was the insistence that even in the face of a denial of Medicaid, abortion remained an open, though perhaps a difficult, choice. Judge Doyle's opinion reflects much thought, but in my view does not persuasively distinguish *Maher*.

tion of one's health "that was not already there." *Id.* This case boils down to a conflict over the allocation of public funds, and the states have been accorded wide latitude in making such allocations. *Id.* at 479, 97 S.Ct. 2376.

Although strict scrutiny of the state's classification is thus inappropriate, the defendants do not automatically prevail. Equal protection analysis has advanced past the day when a simple two-tier framework sufficed for distinguishing between complex, and often close, cases. For example, the Supreme Court has acknowledged the existence of a so-called "middle tier" of scrutiny under which certain classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Orr v. Orr*, 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306 (1979); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). And unlike the Court's approach in an earlier era, *see Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955), an element of "bite" has been added to the "rational basis" test in cases like the instant one, challenging the denial of government benefits. As one distinguished commentator has noted,

> "Despite the Court's refusal to find 'fundamental interests' in welfare benefits and other 'necessities' in cases from *Dandridge v. Williams* through *[San Antonio School District v.] Rodriguez*, the modern scrutiny of welfare legislation has not in fact been as extremely deferential as the repeated references to Williamson v. Lee Optical would suggest. In a number of cases, the Court, while purporting to apply traditional rationality standards, has invalidated legislation."

G. Gunther, *Constitutional Law* 870–71 (9th ed. 1975); *see Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974); *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). These government benefit cases have been characterized by an "emphasis on the *articulated* purpose of the state," G. Gunther, *supra*, at 216 (Supp.1978) (emphasis in original), which purpose must of

course be a legitimate one, *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

■ I turn, then, to an examination of the purposes identified by the defendants as animating their refusal to fund therapeutic abortions. A number of such interests are articulated, including an interest in protection of the fetus, in protecting the potentiality of human life, and in the state's rate of population growth. Defendants' Brief at 40. Although each of these has been mentioned by the Supreme Court, they are all subsumed under the state's general interest in "encouraging normal childbirth," *id.*, relied on so heavily by the *Maher* Court. 432 U.S. at 477, 478, 479, 97 S.Ct. 2376. It is important to note that the Court time and again used the term "normal" to denote that state interest which could legitimately overcome a claim to funds for elective abortions. But the same term is inapplicable to the instant case. The state's regulation cannot possibly encourage normal childbirth because childbirth in a woman who needs a therapeutic abortion cannot be termed "normal."

Nor can a state legitimately choose to "encourage childbirth" no matter what the cost to the pregnant woman. *Roe v. Wade* and its progeny have made abundantly clear that in this sensitive area, a state may not place the life of the fetus on a higher plane than the health of the mother. *See Colautti v. Franklin*, 439 U.S. 379, 400, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Roe v. Wade, supra*, 410 U.S. at 163–64, 93 S.Ct. [705] at 732. Even as late as the third trimester, for instance, the state may not proscribe abortion "when it is necessary to preserve the life *or health* of the mother." *Id.* (emphasis added). In sum, then, Connecticut's regulation cannot rationally further the state's legitimate interest in "encouraging normal childbirth." And a state cannot legitimately choose to "encourage childbirth" at the expense of the mother's health. *See Zbaraz v. Quern*, 469 F.Supp. 1212, 1219 (N.D.Ill.1979), *probable jurisdiction determination postponed pending argu-*

*ments*, —— U.S. ——, 100 S.Ct. 447, 62 L.Ed.2d 374 (1979).[15]

The defendants also assert a fiscal interest in refusing to pay for therapeutic abortions. This claim patently contradicts the established facts, which reveal that the state could fund nearly eight first-trimester abortions for every one childbirth it covers. There is no evidence in the record to support the claims that "up to three abortions may be required for every birth averted in the long run," that the complication rate for abortion is high, or that abortion funding "can form a serious drain on medical resources."[16] Hardy, *Privacy and Public Funding*, 18 Ariz.L.Rev. 903, 927–32 (1977). Defendants' reliance on a secondary source that in turn relies largely on foreign studies and questionable conjecture is thus unconvincing and insufficient to overcome the obvious irrationality of the state's purported "fiscal interest." This conclusion is driven home by the realization that the state will in most cases have to support the newborn infant well into young adulthood and perhaps beyond. Although the *Maher* Court noted that subsidizing the costs of childbirth was a rational means of encouraging that expensive alternative, 432 U.S. at 479, 97 S.Ct. 2376, the alternative favored by the state in *Maher* was a permissible one; here, such subsidization for women needing therapeutic abortions cannot promote normal childbirth, and the "alternative" that would be "encouraged" by the state is not a legitimate one. *Maher*'s reasoning on this point is therefore inapposite.

Section 275, then, is not rationally related to any legitimate, articulated state interest and the exclusion of therapeutic abortions from Medicaid coverage, being irrational, violates the equal protection clause. It thus becomes unnecessary for me to consider the plaintiffs' other constitutional claims, on which I express no opinion.

### Relief

"'Where a statute is defective because of under inclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage to include those who are aggrieved by exclusion.'" *Vaccarella v. Fusari*, 365 F.Supp. 1164, 1170 (D.Conn.1973) (3-judge court), *quoting Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in the result); *see Orr v. Orr, supra*, 440 U.S. at 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979) ("In every equal protection attack upon a statute challenged as underinclusive, the State may satisfy the Constitution's commands either by extending benefits to the previously disfavored class or by denying benefits to both parties."). The same principles apply to an underinclusive regulation such as the one challenged in the instant case.

The invalidation of section 275 as a whole "would bring about a result which no one seeks." *Vaccarella v. Fusari, supra*, at 1170. The more appropriate alternative, then, is the extension of Medicaid benefits

**15.** The Supreme Court may face the question posed by the instant case when it hears and decides *Zbaraz* later this Term. The district court's holding in *Zbaraz*, however, limited the state's funding obligation to those abortions performed in the first trimester of pregnancy. In light of my conclusion that the state may never place a higher value on the life of the fetus than on the health of the mother, my holding is necessarily broader than Judge Grady's in *Zbaraz* in that it extends to all medically necessary abortions for Medicaid-eligible women, both before and after the point of fetal viability.

**16.** It seems likely that complications are at least as frequent in pregnancy and childbirth as in abortion, given the accepted view that abortion is safer than normal childbirth. *Roe v. Wade, supra*, 410 U.S. at 149, 93 S.Ct. 705. The facts in this case amply demonstrate that with respect to women in need of *therapeutic* abortions, many pregnancy and childbirth complications can be expected—complications for which the state's Medicaid program is quite willing to pay. Furthermore, even if abortion does place a "drain" on medical resources, it should be biologically, as well as medically, evident that the refusal to fund therapeutic abortions simply postpones that drain for nine months; it does not diminish it.

to eligible women needing therapeutic abortions. Irreparable injury and the absence of an adequate remedy at law were demonstrated at earlier stages of this proceeding. The plaintiffs now having succeeded on the merits, an injunction will issue requiring payment for all medically necessary abortions, and it is

SO ORDERED.